**Johnson LEE, Plaintiff–Appellant,**

v.

**BSB GREENWICH MORTGAGE LIM-ITED PARTNERSHIP, BSB Green-wich Mortgage Limited Partnership, Defendant–Appellee,**

**Lee & Lee Construction Company, Wa-terford of Greenwich Associates, Consolidated–Defendants,**

**Federal Deposit Insurance Corporation, J. Calzone Co., Weathertight Roofing Systems, Inc., Defendants.**

Docket No. 00–6324.

United States Court of Appeals, Second Circuit.

Argued June 8, 2001.

Decided Oct. 9, 2001.

---

Daniel S. Steinberg, Bondy & Schloss (Joseph S. Rosenthal, on the brief), New York, NY, for Plaintiff–Appellant.

Everett E. Newton, Murtha Cullina (Matthew J. Budzik, on the brief), Hartford, CT, for Defendant–Appellee.

Before: KEARSE, STRAUB, and SACK, Circuit Judges.

STRAUB, Circuit Judge:

Plaintiff–Appellant Johnson Lee ("Lee") appeals from an order of the United States District Court for the District of Connecticut (Alan H. Nevas, *Judge*) denying his motion for an order in aid of enforcement of an amended stipulated judgment of strict foreclosure. Under a provision in the amended stipulated judgment, Lee was to receive consideration from Defendant Appellee BSB Greenwich Mortgage Limited Partnership ("BSB") in an amount that depended on the "gross sales proceeds of ... Unsold [condominium] Units." The parties disagreed over the meaning of that term. The District Court, approving, adopting, and ratifying the recommendation of Magistrate Judge Holly B. Fitzsimmons, found the provision ambiguous and, after considering extrinsic evidence, ruled that the term excludes the portion of the condominium units' sales proceeds that only offset costs incurred in customizing the units above a standard amenities allowance. The District Court thus found that BSB correctly calculated the "gross sales proceeds" and therefore did not violate the stipulated judgment.

For the reasons given below, we conclude that the term "gross sales proceeds of ... Unsold Units" is not ambiguous and can only refer to the aggregate proceeds of the condominium units as they were actually sold—that is, to the total proceeds including the increased revenue corresponding to any extra customization costs.

Accordingly, we reverse and remand for calculation of the gross sales proceeds in light of this opinion and, if appropriate, entry of an order in aid of enforcement of the amended stipulated judgment.

## BACKGROUND

In 1985, Johnson Lee and his real estate development companies, Lee & Lee Construction Corp. and Montgomery & Lee, obtained four mortgages from The Bank Mart to finance the planning and construction of the Waterford of Greenwich project, a four-building luxury condominium complex in Connecticut. The mortgages were secured by real property, including the Waterford property. In the late 1980s, Lee and his companies defaulted on the mortgages. The Bank Mart consequently instituted four foreclosure actions in Connecticut state court, but soon itself became insolvent. Thus, in 1991, the Federal Deposit Insurance Corporation ("FDIC") was appointed receiver of The Bank Mart and took over the foreclosure actions. FDIC removed the foreclosure actions to the United States District Court for the District of Connecticut, and the four actions were consolidated in 1992. In March 1995, the District Court entered a stipulated judgment of strict foreclosure as to the four mortgaged properties. In this stipulated judgment, the District Court valued the four properties and assessed the debts owed by Lee and his companies to FDIC.

One day after entry of the stipulated judgment, FDIC sold and assigned to BSB its interests in each of the mortgages and notes at issue in the four consolidated foreclosure actions. BSB, as a result, was substituted as plaintiff in the District Court actions. In April 1995, BSB and Lee entered into an amended stipulated judgment of strict foreclosure, which var-

ied the terms of and superseded the original stipulated judgment between Lee and FDIC. This amended stipulated judgment adopted the property values and debt amounts set forth in the original stipulated judgment, and provided that if by a certain date Lee paid BSB the total debt owed, BSB would release the mortgages and dismiss the actions. If, however, Lee did not pay his debt, the partially completed Waterford project would be transferred to BSB and Lee would be released from his obligations under all of the mortgages.

The amended stipulated judgment also contemplated the continued cooperation by Lee in the ongoing construction of the Waterford after BSB's acquisition of the property. In exchange for such cooperation, BSB agreed to provide Lee with certain compensation. First, as up-front consideration, BSB agreed to transfer to Lee one unit in the condominium complex, subject to the restriction that Lee could not resell the unit until twenty-one of the remaining twenty-two unsold units[1] in the complex were sold, or three years from the date of the transfer to Lee, whichever occurred first. Second, the agreement provided for two types of back-end consideration. In paragraph 29 of the amended stipulated judgment, the parties agreed that upon the completion of all remaining construction required to resell the uncompleted unsold units in the Waterford, including all common areas and all amenities, BSB would pay Lee the amount by which the actual construction costs were less than the budgeted amount of $4,900,000, up to a maximum of $100,000.[2] In paragraph 30, the parties agreed that if the "gross sales proceeds of 21 of the 22 Unsold Units" were less than $26,500,000, Lee would have the option to purchase the remaining completed unsold unit for the amount by which the gross sales proceeds were less than $26,500,000. Am. Stipulated J. at 18–19. If Lee chose not to exercise this option, BSB was to sell the final unsold unit and pay Lee the amount by which the gross sales proceeds of all units sold exceeded $26,500,000, up to a maximum of $1,000,000. If, on the other hand, the "gross sales proceeds of 21 of the 22 remaining Unsold Units" equaled or exceeded $26,500,000, BSB was to convey the final completed unsold unit to Lee by quit-claim deed. *Id.* at 19. BSB also agreed to keep Lee reasonably informed as to marketing and sales progress.[3] The

---

1. There are twenty-four total units in the Waterford complex, with six units in each of the four buildings. One unit, Unit 10, had already been sold. With Unit 12 going to Lee, that left twenty-two unsold units.

2. Paragraph 29 reads in its entirety:

   29. Upon the completion of all remaining construction required to resell the uncompleted Unsold Units within the Waterford Property, including all common areas and limited common areas and all amenities associated therewith, BSB shall pay Johnson Lee a sum equal to the amount by which the actual cost of all of said remaining construction is less than the budgeted amount of $4,900,000.00 but in no event shall such payment to Johnson Lee exceed $100,000.00. BSB will keep Johnson Lee reasonably informed as to the costs of construction. In the event the costs recited in Paragraph 28 related to occupant removal and repair of the Premises exceeds the amount of funds escrowed, such amount shall be deducted from any payment due to Johnson Lee pursuant to this Paragraph. Said payment shall occur at the expiration of any statutory warranties related to the construction of the condominium units and amenities related thereto.
   Am. Stipulated J. at 18.

3. Paragraph 30 reads in its entirety:

   30. If the gross sales proceeds of 21 of the 22 Unsold Units remaining after the transfer to Johnson Lee of Unit 12 pursuant to a previous provision herein are less than $26,500,000.00, Johnson Lee shall have the option to purchase the remaining completed Unsold Unit for the amount by which the

amended stipulated judgment defines "Unsold Units" as "[s]uch condominium units comprising the Waterford Property other than Condominium Unit 10." *Id.* at 4. It does not, however, define "gross sales proceeds."

In 1995, BSB acquired the Waterford project pursuant to the stipulated judgment and began marketing and selling the unsold units. In doing so, BSB found that many prospective purchasers wanted their uncompleted units customized to suit their particular preferences. Rather than allowing each buyer to hire his or her own workers to perform customization work, which would have complicated the construction and sale of the units, BSB agreed to supervise construction of the buyers' selected amenities using workers of the buyers' choosing and to add the customization costs to the final price of the units rather than billing the buyers separately. BSB did not intend to reap a profit from the customization work, but rather planned to increase the final unit prices only by the amounts charged by the workers. Accordingly, BSB altered its form purchase agreement to include an allowance for "Seller's Work," representing the portion of the purchase price allotted to completing the units according to the buyers'

wishes. The seller's work allowance for the units in one building was $150,000 and for the units in two of the other buildings was $225,000.[4] If the actual cost of performing the buyer's requested work was more or less than the seller's work allowance, BSB would adjust the purchase price of the unit accordingly. Thus, in certain instances buyers requested extra amenities which raised the cost above the seller's work allowance; BSB passed these costs onto the buyers through an increased purchase price. In those cases where purchasers wished to use their own contractors to complete uncompleted units, units were sold without any "seller's work." BSB sold these units after discounting the purchase prices by either $150,000 or $225,000, depending on the building in which the unit was located.

The last completed unsold unit was Unit 1. On January 30, 1998, BSB entered into a purchase agreement to sell Unit 1 to a third party for $1,275,000. Before doing so, BSB did not notify Lee that the other unsold units had been sold or provide Lee with information regarding the marketing and sale of Unit 1. When Lee discovered that twenty-one of the twenty-two remaining units had been sold, he asked BSB for an account of the gross sales proceeds of

gross sales proceeds are less than $26,500,000.00. Johnson Lee shall have a period of 30 days after notice from BSB of the sale of 21 of the remaining 22 Unsold Units in which to exercise said option and close upon the purchase of said remaining unit, time being of the essence. If the gross sales proceeds are less than $26,500,000.00 as aforesaid and in the event Johnson Lee elects not to exercise said option or otherwise fails to exercise said option, BSB shall sell the final Unsold Unit and pay to Johnson Lee the amount by which the gross sales proceeds of all units sold by BSB exceed $26,500,000.00 but in no event shall such payment to Johnson Lee exceed $1,000,000.00. In the event that the gross sales proceeds of 21 of the 22 remaining Unsold Units within the Waterford property

equal or exceed $26,500,000.00, BSB shall convey the final completed Unsold Unit to Johnson Lee. During the time that Unsold Units are being marketed, BSB will keep Johnson Lee reasonably informed as to marketing and sales. Any conveyance to Johnson Lee pursuant to this paragraph shall be by Quit Claim Deed as is and where is, as to both its physical condition and state of title with no representations or warranties whatsoever.
Am. Stipulated J. at 18–19.

4. There was no seller's work allowance for the fourth building because the units in that building had already been completely constructed.

those units. The parties thereupon discovered that they disagreed over the meaning of the term "gross sales proceeds of 21 of the 22 Unsold Units." BSB claimed that the "gross sales proceeds of 21 of the 22 Unsold Units" totaled $24,674,200, entitling Lee to purchase Unit 1 for $1,825,800, or the difference between $24,674,200 and $26,500,000. In arriving at the $24,674,200 figure, BSB had excluded the increase in purchase price corresponding to the costs above and beyond the seller's work allowance in those instances in which buyers requested extra amenities. BSB argued that the parties did not mean to include these extra amounts in "gross sales proceeds" because at the time of the agreement the parties had not planned to construct extra amenities and because the extra amounts did not confer any profit on BSB. Thus, BSB contended, "gross sales proceeds of ... Unsold Units" referred to "standard units," or the units completed with only the seller's work allowances, and should not include the proceeds generated by the construction of any amenities beyond the standard seller's work.[5] Lee, on the other hand, argued that "gross sales proceeds of ... Unsold Units" referred to the total of the prices charged for the units as sold, including the additional amounts charged to cover the costs of the extra customization work beyond the seller's work allowance. Under Lee's formulation, the "gross sales proceeds" amounted to at least $25,373,523, which would have significantly reduced the cost of Unit 1 for Lee.

Lee objected to BSB's calculation of the gross sales proceeds but the parties were unable to resolve their dispute. In April 1998, BSB went ahead with its sale of Unit 1 to the third-party purchaser for $1,275,000. Lee thus filed a motion in the District Court seeking an order in aid of enforcement of the amended stipulated judgment of strict foreclosure. In his motion, Lee claimed that the gross sales proceeds might be even greater than $26,500,000, entitling him to conveyance of Unit 1 at no cost.

The District Court referred the matter to United States Magistrate Judge Holly B. Fitzsimmons. The Magistrate Judge framed the issue as whether the "gross sales proceeds" calculation "must be based on the selling price as 'units-plus-amenities,' also referred to as 'units-plus-extras' or 'amenities,' " as Lee argued, or must be "based on the sale of 'standard units' or 'plain vanilla units,' " as BSB argued. After a two-day hearing in April 2000, the Magistrate Judge issued a recommendation dated August 14, 2000.

The Magistrate Judge first found that the term "gross sales proceeds" in the stipulated judgment was ambiguous. According to the Magistrate Judge, the term suffered from a latent ambiguity because the parties disagreed as to its meaning and the amended stipulated judgment did not define it. Thus, the Magistrate allowed the use of parol evidence to aid in the term's interpretation. The Magistrate Judge then ruled that Lee had the burden of proving by a preponderance of the evidence that the parties had a meeting of the minds as to the meaning of "gross sales proceeds" at the time of the execution of the contract. Looking at extrinsic evidence to determine whether Lee met this burden, the Magistrate Judge found that BSB had contracted based on "standard

---

**5.** Notably, in those cases in which BSB discounted the seller's work for purchasers buying uncompleted or "sub-standard" units, BSB did not add back into the gross sales proceeds the amount of the discount. At oral argument before this Court, BSB's counsel called this error an "oversight" that was "done unintentionally."

units," not the unsold units as they were actually sold.

Lee objected to the Magistrate Judge's recommendation. The District Court, however, approved, adopted, and ratified the recommendation without opinion. This timely appeal followed.

## DISCUSSION

Under Connecticut law, "[a] judgment entered in accordance with ... a stipulation of the parties is to be regarded and construed as a contract." *Barnard v. Barnard*, 214 Conn. 99, 109, 570 A.2d 690, 695 (1990). We review a district court's interpretation of a contract *de novo. Olin Corp. v. Ins. Co. of N. Am.*, 221 F.3d 307, 320 (2d Cir.2000). Likewise, "[a] lower court's threshold determination as to whether a contract is ambiguous ... is subject to *de novo* review." *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir.1999).

The primary question on appeal is whether the term "gross sales proceeds of ... Unsold Units" is ambiguous, for "[w]here the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms," *Barnard*, 214 Conn. at 110, 570 A.2d at 696, and resort to parol evidence is not only unnecessary but improper, *see HLO Land Ownership Assocs. Ltd. P'ship v. City of Hartford*, 248 Conn. 350, 359–60, 727 A.2d 1260, 1265–66 (1999); *see also Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir.1993) ("*[I]f ambiguity exists,* then extrinsic evidence of the parties' intent may be looked to as an aid to construing the contractual language." (emphasis added)). "[A] party cannot create an ambiguity in an otherwise plain agreement merely by 'urging different interpretations in the litigation.'" *Red Ball*, 173 F.3d at 484 (quoting *Metro. Life Ins. Co. v. RJR Na-*

*bisco, Inc.*, 906 F.2d 884, 889 (2d Cir. 1990)); *see also Barnard*, 214 Conn. at 110, 570 A.2d at 696 ("A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity and words do not become ambiguous simply because lawyers or laymen contend for different meanings." (internal quotation marks omitted)). "If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." *Red Ball*, 173 F.3d at 484 (citing *Huertas v. E. River Hous. Corp.*, 992 F.2d 1263, 1266 (2d Cir.1993)); *see also Tourangeau v. Uniroyal, Inc.*, 101 F.3d 300, 307 (2d Cir.1996).

The absence of an explicit definition of "gross sales proceeds" does not by itself render that term ambiguous. *See Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 617 (2d Cir.2001) ("[T]he fact that the language of the contract itself does not specify the meaning of a disputed term does not entail that an ambiguity ... exists."); *cf. Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 906 (2d Cir.1997) (noting that the argument that the failure to spell out the implications of a contract term renders the term ambiguous "conflates ambiguity and omission"). Rather, when a contract term is undefined, a court should look to the plain meaning of the language to ascertain whether there is ambiguity. *See Billings v. Billings*, 54 Conn. App. 142, 146, 732 A.2d 814, 818 (1999) ("It is axiomatic that where the parties do not define a term, we look to the plain meaning of the words."); *see also Hugo Boss*, 252 F.3d at 617 (noting that even where a contract does not define a term, "widespread custom or usage" can supply the term's meaning). "Courts do not stretch words to create an ambiguity when their

ordinary meaning leaves no room for such doubt." *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1178 (2d Cir.1995), *cert. denied*, 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996). "Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." *Tallmadge Bros. v. Iroquois Gas Transmission Sys., L.P.*, 252 Conn. 479, 498, 746 A.2d 1277, 1288 (2000) (internal quotation marks omitted). "The question is not what intention existed in the minds of the parties but what intention is expressed in the language used." *Barnard*, 214 Conn. at 110, 570 A.2d at 696 (internal quotation marks omitted). "Contract terms are considered ambiguous if they are capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." [6] *Lightfoot*, 110 F.3d at 906 (internal quotation marks omitted).

■ We hold that the term "gross sales proceeds of . . . Unsold Units" in the amended stipulated judgment is unambiguous. In interpreting contract terms, Connecticut courts "have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Barnard*, 214 Conn. at 110, 570 A.2d at 696. Under such an approach, it is clear that "gross sales proceeds" are just that—the receipts from the sale of the units, without any deductions. "Gross" is defined as "an overall total exclusive of deductions (as taxes, expenses)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1002 (1993). "Gross sales" is defined as "total sales (esp. in retail) before deductions for returns and allowances." BLACK'S LAW DICTIONARY 1338 (7th ed.1999); *see also* BALLENTINE'S LAW DICTIONARY 537 (3d ed.1969) (defining "gross sales" as "[t]he entire amount of the entire sales of a business for a specific period of time"). "Proceeds" is defined as "[t]hat which is received for something whether in cash or other thing of value." BALLENTINE'S LAW DICTIONARY 1000 (3d ed.1969). "Gross proceeds" is defined as "[t]he entire proceeds[;][t]he proceeds of a sale or of a collection without deduction for cost, commissions, or any other expenses whatsoever." BALLENTINE'S LAW DICTIONARY 537 (3d ed.1969). In contrast, "net proceeds" is defined as "the amount received in a transaction minus the costs of the transaction (such as expenses and commissions)." BLACK'S LAW DICTIONARY 1222 (7th ed.1999). Here, any natural reading of "gross sales proceeds" must include the additional revenue received by BSB as a result of the extra amenities. Only "net sales proceeds"—a term avail-

---

**6.** BSB argues that the amended stipulated judgment is not an integrated agreement. Although the District Court did not make factual findings on this issue, we may conclude as a matter of law that the agreement was integrated because "the record before us leaves us with the firm conviction that a reasonable trier of fact could come to but one conclusion." *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1178 (2d Cir.1995), *cert. denied*, 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996). Any view of the evidence leads inexorably to the conclusion that the amended stipulated judgment embodies the final repository of the parties' agreement. *See id.* Furthermore, we find unpersuasive BSB's argument that parol evidence was admitted not to vary contract terms but to explain them. The parol evidence considered by the District Court served to contradict the plain meaning of "gross sales proceeds."

able to the parties which they did not use—could refer to the sales prices minus costs, such as the expense of extra amenities. BSB has provided no reason to believe that "the customs, practices, usages and terminology as generally understood in the particular trade or business," *Lightfoot*, 110 F.3d at 906 (internal quotation marks omitted), call for a different interpretation of "gross sales proceeds."

BSB further argues that, even if "gross sales proceeds" is unambiguous, the contract does not address whether that term refers to the proceeds of the "standard units" or of the "units-plus-amenities." "Unsold Units," however, is unambiguously defined in the stipulation as "such condominium units comprising the Waterford Property other than Condominium Unit 10." The fact that this term does not specify whether the units referred to include the extra amenities beyond the standard seller's work does not render the term ambiguous, for the term must be read as part of the entire phrase "gross sales proceeds of . . . Unsold Units." That complete term can, in our view, refer only to the proceeds of the units *as sold*. By using the word "sales" in "gross sales proceeds of . . . Unsold Units," the contract necessarily contemplates the *sale* of a condominium unit. The units that were *sold* were, in relevant cases, the units with extra amenities, and the sales prices of those units are what must factor into the aggregate "gross sales proceeds." "Gross sales proceeds of . . . Unsold Units" could have referred to standard units *only in those cases in which standard units were sold*. Quite simply, "sales proceeds" cannot refer to prices of items in a condition in which they were never in fact sold. *Cf.* BLACK'S LAW DICTIONARY 1337 (7th ed.1999) (defining "sale" as "[t]he transfer of property or title for a price").

BSB asserts, and the District Court found, that the term "Unsold Units" in paragraph 29 of the amended stipulated judgment—the paragraph dealing with the budgeted construction costs—necessarily refers to standard units without the extra amenities because logic dictates that the parties could not have set a construction budget for an unknown set of amenities. From this, BSB argues that Lee's advancement of a different meaning for "Unsold Units" in paragraph 30 serves to render the term ambiguous. The problem with BSB's argument is that the meaning of "Unsold Units" is not up for debate, as it is a term of art defined in the contract. All that paragraph 29 reveals is that the parties originally contemplated selling only standard units and budgeted $4,900,000 to complete the unsold units to a standard level. However, that does nothing to alter the definition of "Unsold Units." That term carries the same meaning in both paragraph 29 and paragraph 30. Paragraph 29 simply speaks to the "budgeted amount" for building the unsold units to a certain level and the "actual cost" of doing so, while paragraph 30 speaks to the "gross sales proceeds" of those unsold units in the condition in which they are finally sold.

That the parties may not have contemplated performing additional work before selling the units is irrelevant, as a court has "no right to add a new term to a contract, though it were clear that had the attention of the parties been called to it in all probability it would have been inserted." *Hatcho Corp. v. Della Pietra*, 195 Conn. 18, 21, 485 A.2d 1285, 1288 (1985) (internal quotation marks omitted); *see also Collins v. Sears, Roebuck & Co.*, 164 Conn. 369, 375, 321 A.2d 444, 448 (1973) ("[E]ven though a party might prefer to have the court decide the plain effect of his contract contrary to the expressed intention set forth in the agreement, it is not

within the power of the court to make a new or different agreement."). The parties here were sophisticated business entities and were represented by counsel. The fact that in retrospect the agreement was not ideal for BSB cannot lead this Court to find ambiguity where none exists.

## CONCLUSION

For the foregoing reasons, we reverse and remand for calculation of the gross sales proceeds pursuant to paragraph 30 of the amended stipulated judgment of strict foreclosure and, if appropriate, entry of an order in aid of enforcement of the amended stipulated judgment.