JOHNSON LEE *v.* HARLOW, ADAMS AND FRIEDMAN, P.C., ET AL.
(AC 28503)

Flynn, C. J., and Lavine and Beach, Js.

Argued February 18—officially released August 4, 2009

*Alan R. Spirer*, for the appellant (substitute plaintiff).

*Daniel R. Canavan*, with whom, on the brief, were *Christopher L. Brigham, Daniel B. Fitzgerald* and *Stephen P. Wright*, for the appellees (defendants).

*Opinion*

FLYNN, C. J. Before us is a case in which the mortgagee that foreclosed the interest in certain Greenwich real estate of the plaintiff, Johnson Lee,[1] did not honor the agreement it had made, as a part of a foreclosure judgment against Lee, to convey a valuable condominium to him but, instead, sold the condominium to another. Following the breach by the mortgagee, Lee

---

[1] Lee died during the course of this case. Concluding that it was required to consider the motion to dismiss, which is the subject of this appeal, before anything else, the trial court refused to consider a motion to substitute. This was improper. See *Burton* v. *Browd*, 258 Conn. 566, 570–71, 783 A.2d 457 (2001). Accordingly, we ordered the substitution of Donald R. Gustafson, the administrator of the estate of Johnson Lee, on appeal. Nevertheless, we continue to refer to Lee as the plaintiff in this appeal.

brought an action against his former attorneys, the defendants, Harlow, Adams & Friedman, P.C., and Stephen P. Wright, sounding in legal malpractice for their alleged failure to record a copy of the foreclosure judgment on the land records. The court, *Hon. Alfred J. Jennings, Jr.*, judge trial referee, acting on a motion of the defendants, dismissed the action for lack of ripeness because damages were purely hypothetical due to the possibility that Lee could collect a judgment in another pending lawsuit involving the mortgagee and its principals, who had breached the agreement in the foreclosure action. Lee now appeals from the judgment of the trial court dismissing his claims of legal malpractice against the defendants. We conclude that Lee's claims were ripe for adjudication even though damages could be minimized by a recovery in another pending action against the mortgagee and its principals, and, accordingly, we reverse the judgment of the trial court.

The following facts, as reasonably gleaned from the record, are relevant to our consideration of Lee's appeal. Lee was a real estate developer who became involved in litigation with his then mortgage lender, the Bank Mart. Lee was represented by the defendants in that litigation. After the failure of the Bank Mart, the Federal Deposit Insurance Corporation was substituted as receiver, and it removed the litigation to federal court (underlying case).[2] After removal, the Federal Deposit Insurance Corporation sold Lee's loans to BSB Greenwich Mortgage Limited Partnership (BSB Greenwich).

---

[2] There were four foreclosure actions, which were consolidated in the underlying case: *BSB Greenwich Mortgage Ltd. Partnership* v. *Lee*, United States District Court, District of Connecticut, Docket No. 5:92CV139 (TFGD); *BSB Greenwich Mortgage Ltd. Partnership* v. *Lee & Lee Construction Corp.*, United States District Court, District of Connecticut, Docket No. 5:92CV140 (TFGD); *BSB Greenwich Mortgage Ltd. Partnership* v. *Lee & Lee Construction Corp.*, United States District Court, District of Connecticut, Docket No. 5:92CV141 (TFGD); and *BSB Greenwich Mortgage Ltd. Partnership* v. *Lee*, United States District Court, District of Connecticut, Docket No. 5:92CV142 (TFGD).

Pursuant to an April 28, 1995 amended stipulated judgment of strict foreclosure between BSB Greenwich and Lee in the underlying case, BSB Greenwich received title to a luxury condominium complex, Waterford of Greenwich, which had been owed by Lee's company. The judgment provided in relevant part that BSB Greenwich would sell twenty-one of the final twenty-two unsold condominium units, and, if the gross sales proceeds of those twenty-one units was equal to or greater than $26.5 million, BSB Greenwich was required to convey the final unsold unit to Lee at no cost. If, however, the gross sales proceeds of those twenty-one units was less than $26.5 million, Lee had a right to purchase the final unit for the amount by which the total sales was less than $26.5 million. Additionally, if Lee elected not to exercise his option to purchase the last unit, BSB Greenwich was required to pay Lee any proceeds from the total sales in excess of $26.5 million, up to a maximum of $1 million, after the final unit was sold.

In a letter dated March 2, 1998, BSB Greenwich notified Lee that the total gross sales from the twenty-one units was $24,674,200 and that he had an option to purchase the remaining unit for $1,825,800. Lee believed that the gross figures supplied by BSB Greenwich were understated, and he forwarded a copy of the March 2, 1998 letter to Wright. On April 17, 1998, BSB Greenwich sold the final unit to William M. Duncan and Patricia M. Duncan for $1,275,000 in violation of Lee's option rights and without Lee's consent. Upon learning this in August 1998, Lee immediately contacted Wright. Despite these occurrences, from March through December, 1998, Lee and Wright discussed Lee's option rights, which, Wright assured Lee, were fully protected by law.

On March 30, 1999, Lee filed suit against the Duncans in Superior Court; see *Lee* v. *Duncan*, Superior Court,

judicial district of Stamford-Norwalk, Docket No. CV-99-0171435-S (October 31, 2003); claiming that the Duncans were not entitled to purchase the final condominium unit. In Lee's action against the Duncans, the trial court, *Hiller, J.*, rendered summary judgment in the Duncans' favor. On appeal, we agreed with the trial court that the Duncans lacked actual or constructive notice of Lee's interest in the unit at the time they purchased it, there being no certified copy of the stipulated judgment of strict foreclosure in the land records as required by General Statutes § 47-36, and the certificate of foreclosure that was filed in the land records stated that BSB Greenwich had "absolute" title in the property. *Lee v. Duncan*, 88 Conn. App. 319, 326–28, 870 A.2d 1, cert. denied, 274 Conn. 902, 876 A.2d 12 (2005).

On March 31, 1999, Lee moved for an order in aid of enforcement of the stipulated judgment against BSB Greenwich in federal court, *Lee v. BSB Greenwich Mortgage Ltd. Partnership*, United States District Court, District of Connecticut, Docket No. 5:92CV71 (AHN) (motion for order).[3] The District Court ruled in favor of BSB Greenwich on the motion for order, but that ruling was overturned by the United States Court of Appeals for the Second Circuit. *Lee v. BSB Greenwich Mortgage Ltd. Partnership*, 267 F.3d 172 (2d Cir. 2001). On remand, the District Court recalculated the proceeds from the sales of the condominium units and concluded that the total proceeds were in excess of $26.5 million, and it determined that the final unit should have been deeded to Lee at no cost. Accordingly, on April 2, 2003, it awarded judgment in favor of Lee for $1,275,000, plus

[3] There is no explanation in the record as to why the motion for order has a federal docket number different from any of the foreclosures. The face of the motion contains the docket numbers for each of the four foreclosure actions, but the remaining documents from the District Court, which have been provided in our appellate record, show Docket No. 5:92CV71 (AHN). Docket No. 5:92CV71 also is the docket number referenced by the parties to this appeal when discussing the motion for order.

10 percent interest from April 17, 1998. We note that at the time that Judge Jennings ruled on the motion to dismiss, which is the subject of this appeal, no part of that federal judgment had been satisfied. We also are aware that on April 17, 2004, Lee filed an action against BSB Greenwich, its members and its partners in Superior Court claiming that BSB Greenwich had transferred money and assets to avoid paying the judgment. During the course of this appeal, however, Lee and BSB Greenwich entered into a settlement agreement for $750,000.

On May 2, 2000, Lee filed the present malpractice action against the defendants in Superior Court, alleging that his loss of the condominium and the legal fees incurred were due to the malpractice of the defendants. He alleged in part that "had the judgment containing [Lee's] option rights been properly recorded on the land records of the town of Greenwich, or had other necessary and appropriate action been taken, BSB [Greenwich] would not have been able to convey and/ or sell [the final unit to the Duncans] without [Lee's] consent." Lee alleged that the defendants deviated from the standard of care by (1) failing to protect Lee's option rights, (2) failing to record Lee's option rights properly and (3) by giving improper and inaccurate advice.

On July 27, 2000, the defendants filed a motion to dismiss, claiming that the case was not ripe for adjudication. The motion alleged that Lee had a federal action, *Lee* v. *BSB Mortgage Ltd. Partnership*, supra, United States District Court, Docket No. 5:92CV71 (AHN), pending to enforce the amended stipulated judgment against BSB Greenwich, that a trial had been held in that case in April, 2000, and that a decision would be forthcoming. The defendants argued that the present case was not ripe for adjudication because there existed an alternative basis for relief against BSB Greenwich by means of the motion for order in the federal action. On November 21, 2000, the defendants' motion was

denied by the court, *Hon. William B. Lewis*, judge trial referee.

On February 2, 2001, the defendants filed their answer to Lee's complaint, and they alleged two special defenses. The first special defense alleged that Lee's injuries, if any, were caused by his negligence in that he failed to record the stipulated judgment properly, failed to communicate accurately with the defendants, failed to ensure that the stipulated judgment accurately reflected his intentions and that he independently negotiated the terms of the stipulated judgment. The second special defense alleged that Lee failed to take affirmative steps to mitigate damages. Lee denied the special defenses. After Lee filed an amended complaint to correct a typographical error, the defendants filed a new answer asserting only one special defense, alleging only that Lee's injuries, if any, were caused by his negligence in that he failed to (1) record the stipulated judgment properly, (2) advise the defendants of the option offer and his dispute of the purchase price and (3) timely take action to enforce his rights under the stipulated judgment. This special defense also was denied by Lee.

On March 13, 2006, the defendants filed another motion to dismiss the legal malpractice claim against them, again claiming lack of ripeness. The defendants claimed that Lee "already obtained a $1.275 million judgment against BSB Greenwich . . . in an underlying action, which fully compensates him for any damages he purports to seek in this legal malpractice claim against the defendants." The defendants also alleged that Lee had not taken action to enforce the $1.275 million judgment against BSB Greenwich, and, therefore, the injuries alleged by him merely were hypothetical. In a memorandum of decision filed September 19, 2006, Judge Jennings granted the defendants' motion to dismiss, concluding that Lee's claims were not ripe for adjudication. This appeal followed.

"The standard of review for a court's decision on a motion to dismiss is well settled. A motion to dismiss tests, inter alia, whether, on the face of the record, the court is without jurisdiction. . . . When a . . . court decides a jurisdictional question raised by a pretrial motion to dismiss, it must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . . The motion to dismiss . . . admits all facts [that] are well pleaded, invokes the existing record and must be decided upon that alone." (Internal quotation marks omitted.) *State* v. *Marsh & McLennan Cos.*, 286 Conn. 454, 463–64, 944 A.2d 315 (2008). "In an appeal from the granting of a motion to dismiss on the ground of subject matter jurisdiction, this court's review is plenary. . . . Ripeness is a justiciability doctrine, which implicates the court's subject matter jurisdiction." (Citation omitted; internal quotation marks omitted.) *Bloom* v. *Miklovich*, 111 Conn. App. 323, 335–36, 958 A.2d 1283 (2008).

"[J]usticiability comprises several related doctrines, namely, standing, ripeness, mootness and the political question doctrine, that implicate a court's subject matter jurisdiction and its competency to adjudicate a particular matter." (Internal quotation marks omitted.) *Chapman Lumber, Inc.* v. *Tager*, 288 Conn. 69, 86, 952 A.2d 1 (2008). "Justiciability requires (1) that there be an actual controversy between or among the parties to the dispute . . . (2) that the interests of the parties be adverse . . . (3) that the matter in controversy be capable of being adjudicated by judicial power . . . and (4) that the determination of the controversy will result in practical relief to the complainant." (Internal quotation marks omitted.) *Cadle Co.* v. *D'Addario*, 111 Conn. App. 80, 82, 957 A.2d 536 (2008).

"[T]he rationale behind the ripeness requirement is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements . . . . Accordingly, in determining whether a case is ripe, a trial court must be satisfied that the case before [it] does not present a hypothetical injury or a claim contingent upon some event that has not and indeed may never transpire." (Citation omitted; internal quotation marks omitted.) *Chapman Lumber, Inc.* v. *Tager,* supra, 288 Conn. 86–87.

"In general, the plaintiff in an attorney malpractice action must establish: (1) the existence of an attorney-client relationship; (2) the attorney's wrongful act or omission; (3) causation; and (4) damages." *Mayer* v. *Biafore, Florek & O'Neill,* 245 Conn. 88, 92, 713 A.2d 1267 (1998). When proof of the existence of an attorney-client relationship is conceded, proof of the second element, a wrongful act or omission, normally involves expert testimony as to the existence of a professional duty on the part of the attorney and a departure from it by some negligent act or omission. See *Davis* v. *Margolis,* 215 Conn. 408, 416, 576 A.2d 489 (1990).

As to causation: "In legal malpractice actions, the plaintiff typically proves that the defendant attorney's professional negligence caused injury to the plaintiff by presenting evidence of what would have happened in the underlying action had the defendant not been negligent. This traditional method of presenting the merits of the underlying action is often called the 'case-within-a-case.' 5 R. Mallen & J. Smith, Legal Malpractice (5th Ed. 2000) § 33.8, pp. 69–70." *Margolin* v. *Kleban & Samor, P.C.,* 275 Conn. 765, 775 n.9, 882 A.2d 653 (2005).

In the present appeal, we are called on to determine whether the court properly held that Lee's claims of legal malpractice were not ripe for adjudication. Lee argues that he sufficiently alleged each element of the

legal malpractice cause of action in his complaint and that each element can be proven. He further argues that, although he "might be able to mitigate his damages through further litigation against BSB [Greenwich] and [its] insiders, [his legal malpractice] claims were not contingent upon such litigation. . . . The defendants' desire to have the plaintiff mitigate his damages does not make [the] plaintiff's claim[s] nonjusticiable." We agree that Lee's action was filed before he knew whether, or to what extent, damages might be minimized by other litigation but conclude that, because the underlying case had concluded, this case, nonetheless, was justiciable. We conclude, therefore, that the court improperly dismissed the action.

In the present case, in rendering its decision, the court focused on the fact that the specific dollar amount of Lee's damages could not be ascertained at that time. Specifically, the court held that "this legal malpractice action is not ripe for adjudication because of the complexity of the unresolved issues of enforcement or collection of the plaintiff's $1.275 million federal court judgment in the underlying disputes against BSB [Greenwich] and its partners and the members of the partners. The case at this point is hypothetical. If the plaintiff is successful in collecting its damages in the underlying action, it would not be able to show causation of damages against the attorney-defendants in this action."

At the outset, we note that we understand the court's practical dilemma when it was faced with this motion to dismiss. Another action, the 1999 motion for order, had been remanded from the Second Circuit back to the District Court, resulting in a final judgment in favor of Lee in the amount of $1.275 million, plus interest, against BSB Greenwich, which appeared to be uncollectable. The uncollectability of this judgment served as the basis for Lee's later action, filed in the Superior

Court on April 17, 2004, against BSB Greenwich, its members and its partners, claiming that BSB Greenwich had transferred money and assets to avoid paying the judgment against it. When the trial court was considering the defendants' motion to dismiss in the present case, the April 17, 2004 action remained pending and had not been heard. BSB Greenwich, its members and its partners, as the parties in interest to the amended stipulated judgment of strict foreclosure, were the parties primarily obligated to Lee because, if they had fulfilled their obligations under the stipulation, the condominium unit at issue would not have been sold to the Duncans, depriving Lee of his interest in the unit, and Lee would not have had to have sought further relief to secure his rights under the stipulation.

In ruling on the defendants' motion to dismiss, the court explained that the issues were complex and that Lee's damages purely were hypothetical at that point in time because there was a possibility that Lee could collect the full $1.275 million judgment as a result of the April 17, 2004 action, and, relying on *Fontanella* v. *Marcucci*, 89 Conn. App. 690, 877 A.2d 828, cert. granted, 275 Conn. 907, 882 A.2d 670 (2005) (appeal withdrawn March 8, 2006), it then held that the "pendency of the underlying litigation tolls the statute of limitations for the legal malpractice action in this case." Because we understand the court's mistaken reliance on *Fontanella*, we take this time to further explain that case and its distinction from the present case.

In *Fontanella*, the plaintiffs originally had commenced a product liability action against an automobile manufacturer in which they had claimed that injuries suffered as a result of a car accident were caused by a defective seat belt. Id., 694. The seat belt was alleged to have been defective in one of two ways, either by design or by manufacture. Id., 704. During the pendency of the litigation, the vehicle was sold to the plaintiffs'

insurer, allegedly on the advice of the plaintiffs' attorney, and it was unavailable for inspection or for evidence. Id., 694. The plaintiffs then brought a malpractice claim against their attorney, claiming spoliation of evidence. Id., 694–95. The trial court twice dismissed the malpractice claim after it had been commenced, agreeing with the defendant attorney that the claim was not ripe for adjudication until the underlying product liability case fully was resolved. Id., 692–93 n.2. Once the underlying product liability case fully was resolved, however, and the plaintiffs reinstituted the malpractice claim, the trial court granted the defendant attorney's next motion to dismiss. This third dismissal was on the ground that the malpractice claim now was barred by the statute of limitations because it had not been timely commenced. Id.

The defendant attorney in *Fontanella* twice had moved to dismiss the case on the ground that it was unripe for adjudication because the underlying case had not been resolved fully, and the court agreed; once the underlying case fully was resolved, however, the defendant attorney then moved to dismiss the case on the ground that it was barred by the statute of limitations because it had not been commenced timely, and the court agreed with that claim also. On appeal, we recognized that it would be unjust for the law to require such a dismissal because the result would be that the plaintiffs were damned when they did commence the lawsuits and damned when they did not. Accordingly, we did not agree that the statute of limitations had run on the malpractice claim and held, instead, that it had been tolled. Id., 692 n.1. The reason we did not agree, however, was not simply because of the complexity of the case or because the precise dollar amount of the malpractice claim was uncertain; rather, we disagreed that the statute of limitations had run because the underlying case still was in progress and the jury had

yet to determine whether there was a design defect in the seat belt. Id., 704–705. If the jury went on to find that the seat belt was defective by design, the actual seat belt from the vehicle that allegedly had caused the plaintiffs' injuries would not have been necessary to the case because any seat belt having that design also would have been defective and, thus, could have been used for inspection and for evidence in the underlying case. Id. On the other hand, if the plaintiffs' case rested on defective manufacture, there might have been malpractice if the jury could not assess whether there existed a manufacturing defect because the actual seat belt from the vehicle *would* have been necessary for such an assessment. Id. Accordingly, if the jury determined that there was a design defect in the seat belt, there could be no malpractice because the seat belt would not have been necessary to the case, there could have been no duty on the part of the attorney to preserve the seat belt, or a breach of any nonexistent duty, and the plaintiffs would not have suffered a legal injury, a necessary element to a claim of legal malpractice.

In short, the underlying case in *Fontanella* had not been resolved when the earlier motions to dismiss had been granted on ripeness grounds, and, until it was resolved, there remained a question as to whether the actual seat belt was necessary to prove the underlying case, and, therefore, the defendant attorney's negligence, proximate causation and the plaintiffs' damages could not have been established. It is for that reason that we concluded that even if the attorney improperly had advised the plaintiffs to allow the insurer to dispose of the vehicle, including its seat belt, the malpractice claim was tolled while the underlying case proceeded because there could be no proof of legal damage proximately caused by this improper advice until the jury had returned a verdict or judgment had been entered against the plaintiffs. If the plaintiffs were to win the

underlying case on a design defect theory, there never would be a negligent departure from the professional standards that could be a proximate cause of legal damage, necessary elements of the legal malpractice cause of action.

As stated previously, to prove any legal malpractice claim, a plaintiff must establish the four necessary elements: (1) an attorney-client relationship; (2) a wrongful act or omission by the attorney; (3) proximate cause; and (4) legal damages. See *Mayer* v. *Biafore, Florek & O'Neill*, supra, 245 Conn. 92. Put another way, a plaintiff must prove that there existed an attorney-client relationship and that the client sustained legal injury or damage that proximately was caused by the attorney's wrongful act or omission. See id.

In *Fontanella*, the existence of the first element, the attorney-client relationship, was undisputed. However, all of the remaining elements could not have been proven while the underlying case remained in progress. It would be counterintuitive for our law to have mandated that the malpractice case move forward, with the plaintiffs having to prove that but for the attorney's negligence, the plaintiffs would have been successful in the underlying case, even before that underlying case had been lost and the plaintiffs legally injured because of the attorney's action or omission. Even if the plaintiffs could have proven that the attorney had given bad advice, the plaintiffs could not have proven that this bad advice proximately caused legal injury before they knew the outcome of the underlying case. In most instances, while the underlying case remains pending, there would be no legal injury proximately caused by the attorney's action or omission until and unless the plaintiff lost the underlying case.

In *Fontanella*, the plaintiffs could not prove that the attorney wrongfully and negligently advised them to

release the car to the insurer, resulting in the destruction of the seat belt, until the jury decided which causes of action were proven or not proven, and whether the particular seat belt used in the plaintiffs' vehicle had been necessary to the case. To have a rule that requires a malpractice case to proceed while the underlying case remains in progress would be incongruous in most instances. It is incongruous because the plaintiff in such a malpractice action would have to pay for expert testimony on the proper standard of care for an attorney. In cases like *Fontanella*, a products expert likely would be needed as well to prove the merits of the underlying case, for nothing more than nominal damages, because actual damages could not be established while the underlying case was proceeding and there remained a possibility that the plaintiff in that underlying case would be successful. If the plaintiff did succeed in the malpractice case, but that case concluded before the underlying case concluded, the plaintiff, at most, would collect mere nominal damages because of an inability to prove damages. At the same time, the plaintiff would have incurred legal fees and expert witness fees.

Furthermore, if the plaintiff were successful on the malpractice claim and also successful in the underlying case, there would be a judgment of malpractice, which requires the four necessary elements that preceded the successful prosecution of the underlying case, and, the plaintiff, in actuality and despite a judgment to the contrary, would have incurred no legal damage that was proximately caused by the attorney's action or omission. Since both legal damage and proximate causation are necessary elements of the malpractice cause of action, in such a hypothetical case, where the legal malpractice case proceeded to judgment before the underlying case had concluded, there would have been no malpractice; yet, there would be a judgment to the

contrary. This hypothetical convinces us that it simply makes no rational sense to require such a process.

There is an important distinction to be made between cases like *Fontanella* and the present case. In the present case, although the extent of legal damage was uncertain at the time Lee filed the malpractice claim, the underlying case was over. On the other hand, in *Fontanella*, at the time of each of the earlier motions to dismiss, the underlying case was awaiting adjudication.

In the present case, taking the plaintiff's allegations to be true, as we must when reviewing the propriety of a dismissal on jurisdictional grounds, the defendants' malpractice occurred when they failed to file certain documents on the land records and BSB Greenwich sold the last condominium unit, causing Lee to incur expenses in an attempt to secure his rights under the stipulated judgment in the underlying case. If proven, the loss of this unique property, along with the legal expenses to bring suit against the Duncans and BSB Greenwich, and other possible damages, would meet the legal injury element of a legal malpractice claim, despite the fact that Lee, in another pending action against BSB Greenwich and its principals, might recover the $1.275 million for which BSB Greenwich sold the final condominium unit. In short, the underlying case was over, and the bringing of a separate action in an attempt to minimize the damages allegedly caused by the defendants' failure to file certain documents on the land records at the conclusion of the underlying case would not affect the justiciability of the case. Although the precise amount of damages was uncertain, Lee sufficiently had alleged the necessary elements of a legal malpractice cause of action: he had alleged that there had been an attorney-client relationship and that he had sustained legal injury that was proximately caused by an act or omission of his attorneys.

"Pursuant to Connecticut's ripeness jurisprudence, as long as it is clear that a plaintiff has suffered an injury sufficient to give rise to the cause of action alleged, a lack of certainty as to the precise scope of damages will not prevent the claim from being justiciable." *Chapman Lumber, Inc.* v. *Tager*, supra, 288 Conn. 87–88, citing *Cumberland Farms, Inc.* v. *Groton*, 247 Conn. 196, 211–14, 719 A.2d 465 (1998), and *Mayer* v. *Biafore, Florek & O'Neill*, supra, 245 Conn. 90–92. The plaintiff in the present case sufficiently alleged that he suffered an injury—a property to which he was entitled was sold without his permission, and he incurred legal expenses allegedly because the defendants failed to file a certified copy of the amended stipulated judgment on the land records. Additionally, he has continued to incur legal expenses in an attempt to collect the moneys due from the sale of the last condominium unit. Whether the defendants ultimately were the legal cause of these injuries is yet to be determined. The cause of action, however, was ripe for adjudication before the trial court. As our Supreme Court recently held in *Chapman Lumber, Inc.* v. *Tager*, supra, 89, "even though the amount of the plaintiff's injury was not known with certainty, that circumstance did not render its claims against the defendant unripe and nonjusticiable."

In *Chapman Lumber, Inc.* v. *Tager*, supra, 288 Conn. 73–78, the plaintiff lumber company, which had provided $43,935.44 worth of building materials on credit to a customer, Ronald Scalzo, a self-employed remodeling contractor, sought to recover the amount of Scalzo's debt from the defendant, Clifford L. Tager, Scalzo's attorney, claiming, inter alia, that Tager had conspired with Scalzo to defraud the plaintiff. Tager moved to dismiss the plaintiff's action, claiming that the case was not ripe for adjudication because the plaintiff might

recover the amount owed by Scalzo through the bankruptcy trustee's attempt to recover an asset that Scalzo improperly had transferred, which, Tager claimed, rendered the amount of the plaintiff's damages speculative because he might fully recover from Scalzo. Id., 85. Our Supreme Court disagreed and explained: "Although the exact amount of the plaintiff's damages might have remained uncertain when it commenced this action, it nevertheless was abundantly clear that the plaintiff had sustained some damages and that there was no hope of a full recovery from Scalzo." Id., 87. The court further explained that "the plaintiff's complaint alleged additional injuries that could not have been remedied by a recovery in the bankruptcy court, namely, the costs of collection expended in pursuance of Scalzo. Consequently, even if the plaintiff could have recovered the entirety of the debt in the bankruptcy proceedings, it had alleged additional actionable injuries stemming from the defendant's conduct such that its causes of action would have remained viable. See . . . *Knight* v. *Furlow*, 553 A.2d 1232, 1235 (D.C. 1989) (legal fees and costs expended as result of attorney's alleged malpractice in drafting will constituted actionable harm, rendering malpractice action ripe, despite fact that case contesting will was still pending)." (Citation omitted.) *Chapman Lumber, Inc.* v. *Tager*, supra, 90.

In light of this authority, we conclude that even though the precise amount of Lee's damages was not known at the time he brought suit, because he was attempting to reduce or to minimize those damages, that uncertainty did not render his claims unripe and nonjusticiable. Lee sufficiently alleged each element in his claims for legal malpractice. That he sought to minimize the damages allegedly caused by the defendants' malpractice had no implication on his allegation of a legal injury. The amount of his damages may be

uncertain because of his continued attempts to minimize those damages, but the fact that he has alleged that he sustained *some* legal injury is not uncertain. Once *some* colorable legal injury had occurred, the statute of limitations began to run on his claim of legal malpractice requiring him to commence suit. See *Rosenfield* v. *I. David Marder & Associates, LLC*, 110 Conn. App. 679, 686, 956 A.2d 581 (2008).

In *Rosenfield*, we distinguished *Fontanella*, a case arising out of a claim of negligent breach of a duty to preserve evidence, when the professional duty had not been established in the underlying case. We said: *"Fontanella* v. *Marcucci*, supra, 89 Conn. App. 690, is distinct from the case at bar because in that case, the very existence of legal malpractice was contingent on whether the seat belt that allegedly caused injury had been manufactured defectively or, alternatively, whether the belt and all such belts had been designed defectively. The gist of the plaintiff's malpractice complaint was that the plaintiff's former attorney had been negligent in failing to preserve the belt for expert inspection and use at trial. If the belt had been defective simply because of its design, however, that defect would have been common to all such belts.

"Consequently, in that instance, the belt from any other vehicle could have been used to prove the case, and no legal malpractice would have occurred from failing to preserve the particular belt from the defendant's automobile. As *Fontanella* noted, citing *Mayer* v. *Biafore, Florek & O'Neill*, [supra, 245 Conn. 88], the first prong of justiciability requires that there be an actual controversy between the parties to the dispute. If there were no consequence or significance to the lack of preservation, there could be no controversy between the plaintiff and the former attorney. Because of that prong, the Appellate Court in *Fontanella* held that the legal malpractice claim was tolled until that

issue was resolved." *Rosenfield* v. *I. David Marder & Associates, LLC*, supra, 110 Conn. App. 691 n.10.

The Louisiana Court of Appeals, in *Marchand* v. *Miazza*, 151 So. 2d 372 (La. App. 1963), rejected trying a legal malpractice case before four underlying cases for breach of contract were tried because it would mean trying the underlying cases in a "case within a case" procedure and because damages would be speculative and could, if any of the underlying cases ultimately were won, result in what would amount to double recovery. Id., 376. The court explained: "For the district court to have to try this case at this time would mean that it would have to try all of the issues involved in the other cases to determine whether or not the defendants had breached their contract or been guilty of actionable negligence to the detriment of the plaintiff herein. Even then his finding might be contrary to that finally decided in the four preceding cases. In oral argument counsel for [the] plaintiff frankly admitted that for the district judge in this case to fix damages prior to adjudications in the pending cases, he would have to indulge in speculation of the wildest variety. He would simply have to reach into the air and pull out a figure with regard to each of the four cases . . . . Another consideration in this case is that if [the] plaintiff is successful in this case and should obtain judgment as prayed for and execute on same, it would not preclude her from continuing with the other four cases and collecting the same amount or a substantial part thereof in those cases, thereby unjustly enriching herself to that extent." Id.

We also explained in *Rosenfield*: "A cause of action does not accrue for the purposes of a statute of limitations until all elements are present, including damages, however trivial. However, the occurrence of an act or omission—whether it is a breach of contract or of duty—that causes a direct injury, however slight, may start the statute of limitations running against the right

to maintain an action even if the plaintiff is not aware of the injury, and even if all resulting damages have not yet occurred; it is sufficient if nominal damages are recoverable for the breach or for the wrong, and where that is the case, it is unimportant that the actual or substantial damage is not discovered or does not occur until later. The fact that the extent of the damages cannot be determined at the time of the wrongful act does not postpone the running of the statute of limitations." (Internal quotation marks omitted.) *Rosenfield* v. *I. David Marder & Associates, LLC*, supra, 110 Conn. App. 686. On the basis of the foregoing analysis, we conclude that Lee's legal malpractice claims were ripe for adjudication.

Because of the continued practical quandary faced by the Superior Court with regard to the proper procedure to be employed in cases in which the full extent of the plaintiff's damages are not ascertainable at the time the action is commenced, we also take this time to comment on that subject. In the present case, both parties requested that the trial court stay the legal malpractice action pending the resolution of the cases involving BSB Greenwich and its partners. The court denied the request. Lee also requested that the court bifurcate the proceedings, letting the liability portion move forward, while staying the damages portion, pending a resolution of the cases involving BSB Greenwich and its partners. The court denied this request on the ground that it did not have subject matter jurisdiction over the case and, therefore, could not bifurcate proceedings for which it had no jurisdiction.

We understand the difficulty faced by the parties and the trial court when the statute of limitations is running on a legal malpractice claim because *some* injury has occurred but the full extent of damages cannot be ascertained because of other ongoing litigation. To avoid the parties having to litigate such a cause of action under

such circumstances, the court, in the exercise of its discretion, may stay the proceedings.

In a Michigan case, *Grace* v. *Grace*, 253 Mich. App. 357, 655 N.W.2d 595 (2003), it was demonstrated how a failure to stay a legal malpractice action can result in a windfall benefit to the person most directly responsible for the harm suffered at the expense of the harmed party's former attorney. As explained in 3 R. Mallen & J. Smith, Legal Malpractice (2009 Ed.) § 22:5, p. 119: "The failure to stay or abate the action can subject an attorney to an avoidable liability. For example, in September 1992, a Michigan lawyer was sued for failing to discover the husband's fraud in secreting the full extent of his assets. A year later, the client sued her husband for the same fraud. Relief was denied, but the judgment was reversed in 1996. Upon remand, the client recovered a judgment for $3.1 million against her former husband. In the interim, the legal malpractice action was settled. The court held that the entire amount of the settlement had to be offset from the judgment against the husband, since it was for the same injury." In such a scenario, the fraudulent party, who was most responsible for the plaintiff's loss, received a windfall from the malpractice case against the plaintiff's former lawyer. The loss should justly fall on the party who principally caused it.

"The issue of another action pending presents two recurring situations. First, the legal malpractice may be premature, if an element of the cause of action needs to be adjudicated. . . . Second, there may be a legally cognizable cause of action for legal malpractice, but the apparent error, causal relationship, or the existence or extent of damage may be affected by the resolution of another proceeding. For example, an action against a New York law firm for failing to obtain a first priority secured interest was stayed, because the amount of recovery from the debtor in bankruptcy was uncertain."

4 R. Mallen & J. Smith, Legal Malpractice (2009 Ed.) § 35:10, pp. 1199–1200, discussing *Washington Mutual Bank* v. *Law Office of Robert Jay Gumenick, P.C.*, 561 F. Sup. 2d 410 (S.D.N.Y. 2008).

"The difference between legal prematurity and a discretionary stay were examined in a 1999 Illinois federal court decision. [See *Alper* v. *Altheimer & Gray*, 65 F. Sup. 2d 778 (N.D. Ill. 1999).] The clients sold their discount merchandising business for $53 million. They claimed that the lawyers erred by including their wholesale business. The clients first sued a former employee for a variety of torts. Concurrently, the clients sued the employee and the buyer in federal court for similar wrongs. The clients voluntarily dismissed the state action. The federal action was dismissed, because the judge found that the sales documents encompassed the wholesale business and that no restriction was imposed on the former employee. The court declined to exercise pendent jurisdiction over the state claims. The legal malpractice suit followed. The law firm sought summary judgment on the ground that the action was premature, because the claims against the former employee and buyer had not been resolved. The court disagreed, noting that the judicial construction of the contract established damage, but commented that, if the clients pursued the state claims, 'a stay or some [other] measure might well be appropriate.' " 4 R. Mallen & J. Smith, supra, § 35:10, p. 1200. We agree.

"In the absence of a statutory mandate, the granting of an application or a motion for a stay of an action or proceeding is addressed to the discretion of the trial court . . . ." (Internal quotation marks omitted.) *Voluntown* v. *Rytman*, 21 Conn. App. 275, 287, 573 A.2d 336, cert. denied, 215 Conn. 818, 576 A.2d 548 (1990). "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and

effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis* v. *North American Co.*, 299 U.S. 248, 254–55, 57 S. Ct. 163, 81 L. Ed. 153 (1936). Whether to stay a legal malpractice case when the underlying case has been adjudicated but damages may be minimized substantially by the outcome of another pending action is left to the trial court's sound discretion. However, there is jurisdiction to exercise that discretion.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

In this opinion the other judges concurred.