ROBERT P. NEUBIG *v.* LUANCI
CONSTRUCTION, LLC
(AC 31628)

Bishop, Gruendel and Lavery, Js.

426

Argued May 27—officially released October 12, 2010

*E. James Loughlin*, for the appellant (plaintiff).

*George G. Mowad II*, with whom, on the brief, was *Melissa A. Scozzafava*, for the appellee (defendant).

BISHOP, J. In this case stemming from a contract dispute regarding the purchase and development of certain real property, the plaintiff, Robert P. Neubig, appeals from the judgment rendered by the trial court in favor of the defendant, Luanci Construction, LLC. On appeal, the plaintiff claims that the court improperly (1) determined that he breached the parties' agreement and (2) declined to impose a resulting trust on the subject property for his benefit. We affirm the judgment of the trial court.

The following facts, as found by the trial court, and procedural history are relevant to our resolution of the plaintiff's appeal. At the time of the events giving rise to this litigation, the plaintiff was a site developer whose experience included the installation of roads, septic systems and storm drains in conjunction with real estate development. The defendant was a home building entity whose business, generally, involved the purchase of lots that had already been developed suitably for home construction. In conjunction with his business, the plaintiff entered into a contract with a third party to purchase property in North Branford known as 118 Parsonage Hill Road for $1.2 million. Because he did not have adequate funds to consummate this purchase on his own, the plaintiff, on August 25, 2005, entered into an agreement with the defendant involving the purchase and development of the property through which the defendant would contribute toward the purchase price and receive, in return, a certain number of lots. Accordingly, pursuant to the terms of the parties' agreement, the plaintiff and the defendant each contributed $600,000 toward the purchase price. The plaintiff conveyed the property to the defendant on August 15, 2005, and that deed was recorded on the land records on August 26, 2005. Additionally, in order to secure the defendant's investment in the property, the plaintiff

assigned the purchase and sale agreement that he had with the sellers of the property to the defendant on August 26, 2005.

In order for the plaintiff to reacquire any interest in the property from the defendant, the contract imposed certain obligations on him. Paragraph 3 of the agreement provides: "[The plaintiff] shall be responsible for obtaining approval for a fourteen (14) lot residential subdivision on the subject property, in accordance with site plans, subdivision plans, and specifications agreeable to both parties. [The plaintiff] shall pay all expenses related to said approvals. [The plaintiff] shall have 12 months from the date of purchase of the aforementioned real property to obtain said approvals." The agreement was subsequently amended to extend the deadline for subdivision approval to December 31, 2006. The agreement further provides in paragraph 5: "Upon approval of said lots, [the defendant] shall retain title to the first four (4) approved and 'building permit' ready lots in exchange for [the defendant's] $600,000 contribution. [The defendant] shall convey to [the plaintiff] or an entity he shall form for the purposes of holding title to the remaining property." The agreement also provided that the defendant would have the option to purchase all the remaining approved building permit ready lots for $150,000 each. Finally, the agreement included a provision requiring the plaintiff to pay specified interest to the defendant on the $600,000 advanced by the defendant for the purchase of the property.

In sum, the plaintiff and the defendant entered into an agreement for the purchase of property intended for the development of fourteen building lots. Each paid $600,000 toward the purchase price. The agreement contemplated that the plaintiff would be obligated to obtain the approvals necessary to construct homes on the sites and that once the approvals were received, the defendant would retain title to four of the lots,

transferring two lots to the plaintiff's wife and eight lots back to the plaintiff with the further proviso that the defendant would have the option to purchase those eight lots from the plaintiff at a cost of $150,000 per lot. The agreement provided, as well, that if the plaintiff was unable to obtain approvals within the allotted time, he would have the right to pay the defendant the sum of $600,000, plus interest, in return for a reconveyance of all of the property. Finally, the agreement provided that if the plaintiff did not make such payments, he would have no claim to any of the real property deeded to the defendant as part of their arrangement despite having contributed the sum of $600,000 toward the purchase.

The plaintiff applied for subdivision approval three times. The first application was withdrawn and the second was denied. On October 19, 2006, the North Branford planning and zoning commission approved the third application subject to certain standard and special conditions. One of the conditions required the plaintiff to file with the town clerk a Mylar map[1] showing the plans as finally approved within ninety days of the expiration of the appeal period. If the plaintiff failed to timely file the Mylar map, the subdivision approval would be null and void. The town also required that a performance bond of $417,000 be posted prior to the filing of the Mylar map to ensure that the developer completed the project. Although the plaintiff intended to mortgage the subject property in order to finance the bond, he was unable to do so because the defendant refused to convey the property to him for this purpose. The town of North Branford, however, would not issue a building permit to the plaintiff until the plaintiff filed the required map and posted a performance bond. The

[1] "A Mylar map is a map prepared on a thin polyester film suitable for recording on the land records." *Torgerson* v. *Kenny*, 97 Conn. App. 609, 615 n.5, 905 A.2d 715 (2006), cert. denied, 281 Conn. 913, 916 A.2d 54 (2007).

plaintiff received two extensions, which expired on August 4, 2007, within which to file the Mylar map, but ultimately failed to do so because he could not afford the cost of the bond.

On December 27, 2006, the plaintiff sought to terminate the agreement with the defendant by invoking paragraph 4. Paragraph 4 of the agreement provides: "In the event that [the plaintiff] is unable to obtain said [subdivision] approvals within said time frame, the [plaintiff] shall have thirty (30) days to pay to [the defendant] $600,000 plus all accrued interest (as hereinafter described) in exchange for the aforementioned real property. If [the plaintiff] shall fail to make said payment within said time frame, then title shall rest with [the defendant] and [the defendant] shall have no obligation to repay [the plaintiff] any portion of the purchase price contributed by [the plaintiff] or any other source." In response, the defendant rejected the plaintiff's attempted termination of their arrangement, stating that paragraph 4 was not applicable because the plaintiff had, in fact, obtained subdivision approval but had not complied with the town's requirement that he file a Mylar map and post a performance bond. Subsequently, because of the plaintiff's failure to file the Mylar map and to post the bond, the subdivision approval lapsed.

By way of a five count revised complaint filed September 15, 2008, the plaintiff alleged breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the Connecticut Unfair Trade Practices Act (CUTPA); General Statutes § 42-110a et seq.; unjust enrichment and trust by operation of law. The defendant filed an answer and special defenses, claiming that the plaintiff breached the implied covenant of good faith and fair dealing and that the plaintiff's claims were barred by the doctrine of unclean hands in that he entered into the agreement when he knew or should have known that he did not have the financial resources

to fulfill his contractual obligations. The defendant also filed a counterclaim alleging that the plaintiff had breached the agreement.

Following a bifurcated trial,[2] the court found in favor of the defendant on all of the plaintiff's claims. The court also found in favor of the defendant on its counterclaim that the plaintiff breached the agreement. The court declined to impose either a constructive or resulting trust in favor of the plaintiff, noting that the purpose of having the defendant hold title to the subject property was to provide security for its investment in the project, and because the plaintiff had failed to comply with the agreement, the court reasoned, the remedy of a trust was unavailable to him. The court awarded damages to the defendant on its counterclaim in the amount of $54,641.02, representing interest that the plaintiff was obligated to pay to the defendant pursuant to the agreement, from January 26, 2006, to August 4, 2007, the date on which the subdivision approval lapsed. This appeal followed.

On appeal, the plaintiff does not challenge the court's conclusion as to his claims for breach of contract, breach of the implied covenant of good faith and fair dealing, violation of CUTPA or unjust enrichment. The plaintiff claims only that the court improperly determined that he breached the agreement and that the court incorrectly failed to impose a resulting trust. We address each claim in turn.

I

In challenging the court's finding that he breached the contract, the plaintiff claims that the court erroneously found that the subdivision approvals he obtained were to the mutual satisfaction of the parties, which, he

---

[2] The court first determined the issue of liability and then, in a separate hearing, heard evidence on the issue of damages.

claims, was required pursuant to the terms of the agreement. In making this assertion, the plaintiff misconstrues the plain language of the contract. Nowhere does the contract provide that the subdivision approvals had to be to the parties' mutual satisfaction. Thus, the plaintiff's claim that he did not obtain mutually satisfying approvals is of no avail to him.

We begin by setting forth our standard of review. "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . .

"A contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties [to a contract] is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . [C]ourts do not unmake bargains unwisely made. Absent other infirmities, bargains moved on calculated considerations, and whether provident or improvident, are entitled nevertheless to sanctions of the law. . . . Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement, it is not within its power to make a new and different agreement . . . . As stated by our Supreme Court, a presumption that the language used

is definitive arises when . . . the contract at issue is between sophisticated parties and is commercial in nature." (Citations omitted; internal quotation marks omitted.) *William Raveis Real Estate, Inc.* v. *Newtown Group Properties Ltd. Partnership*, 95 Conn. App. 772, 776–77, 898 A.2d 265 (2006).

"Whether there was a breach of contract is ordinarily a question of fact. . . . We review the court's findings of fact under the clearly erroneous standard. . . . The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . ." (Citation omitted; internal quotation marks omitted.) *Colliers, Dow & Condon, Inc.* v. *Schwartz*, 77 Conn. App. 462, 471–72, 823 A.2d 438 (2003).

At trial, in his motion to reargue and in his appellate brief, the plaintiff concedes that he obtained subdivision approval. Nevertheless, in his appellate brief, the plaintiff claims that the parties had to be mutually satisfied with the conditions imposed by the town for the issuance of building permits. This claim, however, is premised on a flawed reading of the contract. Pursuant to paragraph 3 of the agreement, the plaintiff was responsible for obtaining approval for a fourteen lot residential subdivision of the property "in accordance with site plans, subdivision plans, and specifications agreeable to both parties." The clear and unambiguous language of the contract does not require that the subdivision approvals be to the parties' satisfaction but that the site plans, subdivision plans and specifications be agreeable to both parties. In other words, the agreement

contemplates that the information submitted to the town in its application for the approvals must be agreed upon by both parties. The plaintiff made no claim at trial, nor does he on appeal, that the site plans, subdivision plans or their specifications were not mutually agreed upon by the parties.

Paragraph 5 also provides that the defendant would retain title to the first four " 'building permit' ready lots" and then convey the remaining property to the plaintiff and his wife. Thus, in addition to obtaining subdivision approval, the plaintiff was also required, under the agreement, to make the lots building permit ready. The plaintiff admitted at trial that filing the Mylar map and posting the bond were his responsibilities under the agreement. The plaintiff, however, never fulfilled either of those responsibilities. The court found that because the plaintiff did obtain subdivision approvals, he was not entitled to invoke the buyout option of paragraph 4 of the agreement, which is premised on a failure to obtain approvals from the town. In sum, because the plaintiff failed to timely act on the approvals he had received from the town, and the approvals ultimately lapsed, he was not in a position to provide the defendant four building permit ready lots in exchange for the defendant's interest in the property. Therefore, the court properly found that he breached the contract.

## II

The plaintiff also claims that the court improperly declined to impose a resulting trust on the property. We disagree.

"A resulting trust arises by operation of law at the time of a conveyance when the purchase money for property is paid by one party and the legal title is taken in the name of another." (Internal quotation marks omitted.) *Gold* v. *Rowland*, 296 Conn. 186, 210 n.22, 994 A.2d 106 (2010). The presumption of the existence of

such a trust, however, is one of fact rather than law and "may be rebutted by proof of contrary intent." *Farrah* v. *Farrah*, 187 Conn. 495, 500, 446 A.2d 1075 (1982). The existence of a resulting trust is an issue of fact. Id., 501. "If it can be proved that the intention of the parties was otherwise, there is no resulting trust." (Internal quotation marks omitted.) *Cohen* v. *Cohen*, 182 Conn. 193, 201, 438 A.2d 55 (1980). "In deciding . . . what the intent of the parties was at the time of the conveyance, the court [must] rely upon its impression of the credibility of the witnesses. Intent is a question of fact, the determination of which is not reviewable unless the conclusion drawn by the trier is one which could not reasonably be drawn." (Internal quotation marks omitted.) *Lord* v. *Stavrakis*, 6 Conn. App. 161, 162, 503 A.2d 629, cert. denied, 199 Conn. 804, 506 A.2d 146 (1986). "When the agreement proven is not identical with that implied by law, it cannot be held that the intention of the parties is identical with that implied by law; hence no resulting trust arises." *Wilson* v. *Warner*, 89 Conn. 243, 246, 93 A. 533 (1915). When an agreement is made for a valuable consideration, the presumption of a trust resulting at the time of the conveyance is rebutted. See *Bassett* v. *Pallotti, Andretta & Co.*, 117 Conn. 58, 62, 166 A. 752 (1933); *Andrews* v. *New Britain National Bank*, 113 Conn. 467, 470, 155 A. 838 (1931); *Meeker* v. *Meeker*, 16 Conn. 383, 385 (1844); *Belden* v. *Seymour*, 8 Conn. 304, 311–12 (1831).[3]

---

[3] See also 1 Restatement (Third), Trusts § 9, comment (e), p. 129 (2003) ("Where a transfer of property is made to one person and the purchase price is paid by another, a resulting trust does not arise if the person by whom the purchase price is paid manifests a contrary intention. The normal inference of a purchase-money resulting trust may be overcome by written or spoken words or by the conduct of the parties, or by other evidence, showing in the circumstances an intention that a resulting trust should not arise but rather that the transfer was to serve another purpose. That intention may be found in evidence of either an intention of the payor or an agreement of the payor and transferee that the transaction is to serve some donative, business or other purpose.").

Here, the court properly found, on the basis of the evidence presented, including the testimony of both parties, that the purpose of having the defendant hold title to the property, as required by the agreement, was to provide security for its investment in the development project. In other words, as the court found, the intent of the parties in this regard was set forth in their agreement. The plaintiff also testified at trial as to his understanding of the parties' arrangement. He acknowledged that if he failed to perform his contractual obligations, namely, obtaining approvals for a fourteen lot development or paying the defendant the sum of $600,000, the defendant would maintain title to the subject property free and clear of any claim by the plaintiff. On the basis of the evidence, the court properly denied the plaintiff's claim for a resulting trust.

The court noted, and we agree, that this outcome may appear harsh, as it results in the defendant's ownership of the entire parcel for the sum of $600,000 and the plaintiff's loss of an equal sum, apart from the lost business opportunity.[4] We also agree with the court, however, that the plaintiff, as a businessperson, knew when he entered into this agreement that he was investing a substantial sum of money and that he would lose his interest in the property if he did not obtain the required approvals for the anticipated lots. The record reflects that the plaintiff testified that he knew when he entered into the agreement that he would not secure any ownership interest in the property except in accordance with the terms of the parties' agreement until after he delivered to the defendant four approved and building permit ready lots and that if he did not do so, the defendant would have absolute title to the property

---

[4] As noted, the plaintiff has not challenged on appeal the court's ruling denying his unjust enrichment claim.

with no obligation to the plaintiff.[5] Thus, although the plaintiff lost a $600,000 investment, his loss, ultimately, was the result of his failure to fulfill his obligations under a, perhaps, unwise agreement that is not our role to alter or reform.[6]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[5] The plaintiff's testimony at trial belies his current claim for a resulting trust. He testified, on direct examination, as follows:

"[The Plaintiff's Counsel]: Was there a deadline in the contract within which you had to do something?

"[The Plaintiff]: We had an extended agreement that would expire, I believe, it would have been at the end of December. We had an original agreement. We had an extended agreement that gave us another ninety days to get through the final approval.

"Had I not either performed the building permit ready lots or required [the defendant] to come in and pick up his original advance of money, the title would have vested with [the defendant]. That was the only option I had.

"[The Plaintiff's Counsel]: So, after December 31, 2006, if you didn't ask for an exchange of the property, money for exchange of the property or gotten building permit ready lots, what would have happened?

"[The Plaintiff]: [The defendant] would have held title and had absolutely no obligation to me.

"[The Plaintiff's Counsel]: He would have owned free and clear of any interest of you?

"[The Plaintiff]: Correct.

* * *

"[The Plaintiff's Counsel]: So, you knew when you entered into this agreement in August of 2005 that you would not be obtaining ownership of any of the property until [the defendant] at least received four approved and building permit ready lots, correct?

"[The Plaintiff]: To answer your question, that's correct."

[6] We note that neither party contends that the outcome obtained by the plaintiff's breach of contract, i.e., the retention of title to the property in the defendant with no obligation to the plaintiff, constitutes a penalty or in any other way violates public policy. Accordingly, we do not make that uninvited assessment.