******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JEFFREY R. LEVINSON *v.* KRISTA D.
LAWRENCE ET AL.
(AC 37217)

Lavine, Beach and Sheldon, Js.

*Argued September 29, 2015—officially released January 26, 2016*

(Appeal from Superior Court, judicial district of
Hartford, Scholl, J.)

*Jeffery R. Levinson*, self-represented, the appellant
(plaintiff).

*Alexa J. P. Lindauer*, for the appellee (named
defendant).

*Opinion*

BEACH, J. The plaintiff, Jeffrey R. Levinson, appeals from the judgment of the trial court rendered in favor of the defendant Krista D. Lawrence.[1] He claims that the court erred in finding (1) that a resulting trust had not been created, (2) that the defendant had not been unjustly enriched, and (3) in favor of the defendant on her counterclaim alleging slander of title. We disagree with the plaintiff's first two claims, but agree with the third, and we accordingly affirm in part, and reverse in part, the judgment of the trial court.

The trial court made the following findings. "[The parties] have known each other since college. They had a relationship in 1990 and resumed it in 2002. It has always been a tumultuous one although the plaintiff has been generous with his money throughout the relationship. For example, in 2006 [the plaintiff] paid off [the defendant's] car loan of about $9000. [The defendant] bought the subject property with her [former] husband. They were divorced on March 10, 2003. As part of the divorce judgment, the property was quitclaimed to [the defendant] and she became obligated to execute a note to her [former] husband in the amount of $58,750 payable on February 4, 2007, unless certain other events occurred earlier. Interest on the note was to accrue from February 4, 2005, at the rate of 2 percent per year. A mortgage on the property was placed to secure the note. When the note became due, [the plaintiff] offered to give [the defendant] the money to pay her [former] husband the amount owed him on the note. [The defendant] agreed to accept the money as the easiest option for her. On February 16, 2007, [the defendant] gave [the plaintiff] a check for $61,123.50. Even though [the plaintiff] is a law school graduate, no documentation was prepared or executed by either party at that time evidencing the nature of the transaction. [The defendant] believed that it was a loan that she would repay when the house was sold, if the parties were no longer together. [The defendant] then gave her [former] husband a check in the same amount on February 17, 2007, to satisfy the note. [The defendant] claimed that she would never have agreed to give [the plaintiff] a portion of the house. The house had been a point of contention in her divorce.

"In June, 2008, [the plaintiff] moved into the property with [the defendant]. Although he did not pay the utilities, which increased significantly after he moved in because he worked from home, he was, as [the defendant] described it, 'financially generous,' during their relationship. [The plaintiff] contributed to the expenses of the household and paid for certain work to be done on the house, which [the defendant] could not afford, such as painting, replacing windows, building a closet, remodeling a porch, which [the plaintiff] used as an office. He also purchased a piano as well as a new

washer, dryer and dishwasher for the house, as well as contributed to the purchase of a couch and loveseat.

"From June to December, 2008, the parties' relationship continued to be tumultuous even resulting in violence by [the plaintiff] against [the defendant]. In December, 2008, the parties broke up, but [the plaintiff] refused to move out of the property, creating an intolerable situation for [the defendant] and her daughter, who also lived in the property. In January, 2009, the parties went to counseling where [the plaintiff] presented [the defendant] with a multipage document entitled 'Agreement' in which he claimed to have made significant monetary contributions for improvements to the property during the period of the parties' cohabitation, and that stated that they had orally agreed, at the time [the plaintiff] made the $61,000 payment to [the defendant], that [the plaintiff] would be entitled to a 50 percent interest in the property. The Agreement also provided that [the plaintiff] would remove himself from the property within seventy-two hours of the execution of the Agreement. [The defendant] did not sign the Agreement. [The plaintiff] would not leave the property voluntarily so [the defendant] started eviction proceedings against him in February, 2009. There was another violent confrontation between the parties that month and [the plaintiff] was arrested and a protective order issued against him and he agreed to move out of the property.

"In July, 2010, [the plaintiff] initiated a small claims action against [the defendant] alleging that she refused to return a bottle of wine, a computer, and a camera he claimed belonged to him. A judgment was entered in favor of [the defendant] on this claim.

"[The plaintiff] initiated a civil complaint in Superior Court against [the defendant] in July, 2010, and placed a lis pendens on the property. That action was dismissed. In February, 2011, this action was [commenced]. In January and February, 2013, [the plaintiff] made complaints to the town of West Hartford regarding his claim that improvements to the property were made without the proper building permits even though he claimed he paid for them. [The plaintiff] has continued to harass [the defendant] by this and other actions such as coming into her place of employment, parking in front of her house, and contacting her real estate agent claiming that the house is not described properly in a listing."

In his complaint, the plaintiff alleged that he was entitled to share in the ownership interest in the property by virtue of a resulting trust and that the defendant had been unjustly enriched by the plaintiff's expenditures, renovations, and improvements to the property. The defendant filed a counterclaim alleging, inter alia, slander of title. The court rendered judgment in favor of the defendant on all counts of the complaint and in

favor of the defendant on her counterclaim, and awarded her $13,737.81 in damages and fees. This appeal followed.

I

The plaintiff first claims that the court erred in finding that a resulting trust had not been created. We disagree.

The court disagreed with the plaintiff's claim that the parties had agreed that the plaintiff was entitled to a one-half interest in the property by virtue of his having paid the defendant $61,123.50. The court found that there was no resulting trust because, although the defendant accepted the money from the plaintiff in order to pay her former husband, she never intended that the plaintiff receive an ownership interest in the property. At most, she considered the payment to be a loan to be paid back when the property was sold. The court determined that the plaintiff, who was trained in the law, had made no attempt to formalize the claim until after the parties' relationship had ended. It concluded that the plaintiff failed to prove facts necessary to establish a resulting trust.

"A resulting trust arises by operation of law at the time of a conveyance when the purchase money for property is paid by one party and the legal title is taken in the name of another. . . . The presumption of the existence of such a trust, however, is one of fact rather than law and may be rebutted by proof of contrary intent. . . . The existence of a resulting trust is an issue of fact. . . . If it can be proved that the intention of the parties was otherwise, there is no resulting trust. . . . In deciding . . . what the intent of the parties was at the time of the conveyance, the court [must] rely upon its impression of the credibility of the witnesses. Intent is a question of fact, the determination of which is not reviewable unless the conclusion drawn by the trier is one which could not reasonably be drawn." (Citations omitted; internal quotation marks omitted.) *Neubig* v. *Luanci Construction, LLC*, 124 Conn. App. 425, 434–35, 4 A.3d 1273 (2010).

"The courts should enforce express contracts between nonmarital partners except to the extent that the contract is explicitly founded on the consideration of meretricious sexual services. . . . In the absence of an express contract, the courts should inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract, agreement of partnership or joint venture, or some other tacit understanding between the parties. The courts may also employ the doctrine of quantum meruit, or equitable remedies such as constructive or resulting trusts, when warranted by the facts of the case. . . . Thus, a contract, express or implied, or some other tacit understanding between persons who are not married to one another which does not rely upon their sexual behavior

is enforceable in the courts of this state." (Citations omitted; internal quotation marks omitted.) *Burns* v. *Koellmer*, 11 Conn. App. 375, 380–81, 527 A.2d 1210 (1987).

The plaintiff claims that the court erred in failing to find a resulting trust. He argues that the parties mutually agreed that the defendant would pay the plaintiff $61,123.50 in return for 50 percent ownership of the property.[2] The defendant testified that her relationship with the plaintiff was unstable and she was "conflicted" and "reluctant" to accept the $61,123.50 from the plaintiff; she did so, however, in February, 2007, because "it seemed the easiest way to go," in that she would not have to burden her family members or sell the property. She further testified that "[t]here were no terms" when she accepted the money from the plaintiff other than the plaintiff's statement that "if this relationship goes south then you'll just pay me when you sell the house." She testified that there was "never" an agreement with the plaintiff to give him an ownership interest in the house. She further stated that, at the time the plaintiff gave her the money, the plaintiff did not ask her to sign any document to memorialize the transaction, which omission was inconsistent with the plaintiff's "very meticulous . . . very detailed . . . record keeping." The defendant continued to explain that although the relationship was "tumultuous," the plaintiff moved into the property in June 2008, more than a year after he gave the defendant $61,123.50.

There was no documentary evidence signed or approved by both parties regarding any intent with respect to the transaction. The evidence regarding intent at the time of the transfer was the testimony of the parties themselves. The plaintiff argues that he demonstrated his ownership interest by producing evidence that he spent $45,000 to improve the property and his writing the word "mortgage" in the memorandum portion of certain other checks that he gave to the defendant during their cohabitation. As explained in more detail in part II of this opinion, the court found that the plaintiff's expenditures were not made to safeguard his claimed interest in the property, but rather to increase his, as well as the defendant's, comfort and enjoyment in the home. This finding was not clearly erroneous; the defendant testified that the improvements and renovations were done at the plaintiff's insistence and that it was not her understanding that the plaintiff was making the improvements because he was claiming an ownership interest in the house. Even if the plaintiff's notations on the checks did indicate his intent, such intent was not mutual. The court credited the defendant's testimony that it was not her intent that the plaintiff receive an ownership interest in the property.

The plaintiff argues that the defendant did not offer

evidence, other than self-serving testimony, showing intent contrary to the creation of a resulting trust. It was, however, within the province of the trial court to credit or to discredit testimony as it deemed fit. See *Cadle Co.* v. *D'Addario*, 268 Conn. 441, 462, 844 A.2d 836 (2004) ("In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . It is within the province of the trial court, as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence." [Citation omitted; internal quotation marks omitted.]). The court's crediting of this testimony is dispositive of the defendant's claim of a resulting trust because "[i]f it can be proved that the intention of the parties was otherwise, there is no resulting trust." (Internal quotation marks omitted.) *Neubig* v. *Luanci Construction, LLC*, supra, 124 Conn. App. 435. The court made a finding, supported by the record, that there was no mutual intention sufficient to require the imposition of a resulting trust. The court did not err in finding that there was no equitable basis for imposing a resulting trust.[3]

## II

The plaintiff next claims that the court erred in denying his claim of unjust enrichment. We do not agree.

The plaintiff alleged in the trial court that the defendant was unjustly enriched by his expenditures made to improve the property. The court disagreed and found that "the improvements and renovations regarding the property made by [the plaintiff] were for his as well as [the defendant's] benefit. They made the property a more liveable one for them both. Although the parties discussed certain improvements together and [the defendant] made certain decisions such as the color the house was to be painted and the type of shutter hardware to be installed, most of the expenditures were at [the plaintiff's] initiative and not at [the defendant's] request. [The plaintiff] admitted he gave money for these items 'willingly.' Although [the plaintiff] claims that he would not have made these expenditures if he did not expect to receive an interest in the property, it was clear to the court that the plaintiff made the expenditures for what he described as the 'family home' for his as well as [the defendant's] comfort and enjoyment, and with the expectation that their relationship would endure. [The plaintiff] did not make the improvements to the home for the primary purpose of safeguarding his claimed interest in the property. Therefore, the court concludes that [the defendant] was not unjustly enriched by [the plaintiff's] expenditures."

"Unjust enrichment is a legal doctrine to be applied when no remedy is available pursuant to a contract." (Internal quotation marks omitted.) *Burns* v. *Koellmer*, supra, 11 Conn. App. 383. "A right of recovery under

the doctrine of unjust enrichment is essentially equitable . . . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard. . . . Plaintiffs seeking recovery for unjust enrichment must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment. . . .

"[E]quitable remedies are not bound by formula but are molded to the needs of justice. . . . The court's determinations of whether a particular failure to pay was unjust and whether the defendant was benefited are essentially factual findings . . . that are subject only to a limited scope of review on appeal. . . . Those findings must stand, therefore, unless they are clearly erroneous or involve an abuse of discretion. . . . This limited scope of review is consistent with the general proposition that equitable determinations that depend on the balancing of many factors are committed to the sound discretion of the trial court." (Internal quotation marks omitted.) *Waterview Site Services, Inc.* v. *Pay Day, Inc.*, 125 Conn. App. 561, 569, 11 A.3d 692 (2010), cert. denied, 300 Conn. 910, 12 A.3d 1005 (2011).

"As a general rule, for the benefit to be unjust, the defendant must have solicited it. This doctrine [of unjust enrichment] is inapplicable where the payment has been made officiously, i.e., where the circumstances do not justify the interference with another's affairs resulting from conferring a benefit upon him. . . . [W]here a person has officiously conferred a benefit upon another, the other is enriched but is not considered to be unjustly enriched." (Citation omitted; internal quotation marks omitted.) *Schirmer* v. *Souza*, 126 Conn. App. 759, 770, 12 A.3d 1048 (2011).

The plaintiff claims that there is no evidentiary basis to support the court's finding that the defendant was not unjustly enriched by the improvements and renovations he made to the property. He argues that the defendant "gave inconsistent testimony which abhors logic, and confirms [his] position that the improvements were done by mutual agreement, and both parties participated equally." He contends that he was ousted from the property two months after the improvements were complete and was unable to enjoy such improvements.

The defendant's testimony supports the court's findings that the improvements and renovations on the property were made for the benefit of both parties to make the home in which they both resided more livable, not to safeguard the plaintiff's claimed interest in the property, and that most of the expenditures were made at the plaintiff's initiative, not by the defendant's

request. The defendant testified at trial to the following. In June, 2008, when the plaintiff moved in, the overall condition of the house was "fine," with some cosmetic issues. At the plaintiff's "insistence," he "immediately started having work done on the house." When asked if she requested that any of the work be done, the defendant responded, "No." According to the defendant, it was the plaintiff's idea to paint the exterior of the house and she had minimal involvement in that project; it was the plaintiff's idea to install new windows and he did so because he did not like the existing windows; improvements were made to the three season porch, such as adding French doors and enabling computer usage, because the plaintiff used the porch for office space; the plaintiff replaced some appliances, such as the washer, dryer, and dishwasher, but not at her request; she did not request the plaintiff to replace the storm door and, although the plaintiff contributed to the purchase of a new storm door, it was never installed because the defendant preferred the look of the house without one; she did not request a chimney sweep, she was not happy when the plaintiff sent her a message saying he had scheduled one to come to the house, and she did not think the chimney needed to be swept; she did not request the plaintiff to make plumbing repairs or to renovate the closet; she did not request that the plaintiff have two birch trees removed and, in fact, she did not want them removed; she did not request that new shutter hardware be purchased, but that, as part of the process of painting the exterior of the house, the original shutter hardware had to be taken down and was not usable when the house was painted, so new shutter hardware had to be purchased; the plaintiff did not like the existing couch and loveseat, which were tattered and used by the defendant and her [former] husband, and both parties made payments for a new couch and loveseat. She testified that until her relationship with the plaintiff ended, he had never asked her to reimburse him for the expenditures associated with the improvements or renovations. The plaintiff testified that she believed that the plaintiff wanted the work to be done "primarily for his comfort. . . . I was a single mom and my [former] husband didn't do a lot of stuff and I think it gave him a great sense of satisfaction to show my friends, and neighbors, and family that he could do all of these wonderful things in the house." She explained that she allowed the plaintiff to do all the projects because "it seemed the easier path to take. Mostly I allowed it to happen, I was indifferent," and that if she resisted the plaintiff's efforts, he would get "angry." She stated that she first learned that the plaintiff was claiming that she owed him money for the projects in a couple's therapy session that occurred after their relationship had soured.

Accordingly, there was evidence from which the court could reasonably conclude that the plaintiff's

expenditures were made officiously and not at the defendant's request. The trial judge, as the finder of fact in this case, was the sole arbiter of credibility. "[I]t is the exclusive province of the trier of fact to weigh the conflicting evidence, determine the credibility of witnesses and determine whether to accept some, all or none of a witness' testimony. . . . Thus, if the court's dispositive finding . . . was not clearly erroneous, then the judgment must be affirmed." (Emphasis omitted; internal quotation marks omitted.) *Stein* v. *Tong*, 117 Conn. App. 19, 24, 979 A.2d 494 (2009). The court's findings that the plaintiff did not request that the expenditures be made, and, rather, that most resulted from the plaintiff's insistence, were not clearly erroneous and are dispositive of this claim. The court did not err in concluding that, although the defendant perhaps benefitted from the plaintiff's expenditures, she was not unjustly enriched.

### III

The plaintiff's final claim is that the court erred in finding in favor of the defendant on her counterclaim alleging slander of title. She alleged in the counterclaim that the plaintiff had refused to release two invalid notices of lis pendens on the property in a timely manner, in violation of General Statutes § 49-8. We agree with the plaintiff.

In the trial court, the defendant sought statutory damages and attorney's fees, pursuant to § 49-8, for the plaintiff's failure to release two notices of lis pendens on the property that were filed in 2010 and 2011 respectively.[4] In finding in favor of the defendant on this claim, the court made the following factual findings and legal conclusions. "The evidence establishes that by letter dated June 23, 2011, [the defendant's] attorney made demand that [the plaintiff] release the lis pendens he had recorded on July 20, 2010, because it was not served as required by statute. See General Statutes § 52-325 (c). By letter dated February 15, 2013, [the defendant's] attorney made demand that [the plaintiff] release the lis pendens he had recorded on August 3, 2011. . . . By stipulation entered in the context of this lawsuit on July 1, 2013, the parties agreed that the plaintiff would file releases of the lis pendens by July 5, 2013, and the defendant would market the property. The plaintiff executed a release of the 2010 lis pendens on July 30, 2013, which was recorded on August 8, 2013, and a release of the 2011 lis pendens on August 7, 2013, which was recorded on August 13, 2013. Because of the delay in the execution of the releases, [the defendant] is entitled to statutory damages in the amount of $5000 as to the 2010 lis pendens and $3000 as to the 2011 lis pendens. She is also entitled to attorney's fees which she incurred pursuing the release of the liens in the amount of $5,737.81, based on the evidence presented."

The plaintiff argues that he was justified in filing the

lis pendens pursuant to § 52-325 to protect his claim of an ownership interest in the property and that the court erred when it awarded the defendant damages and attorney's fees pursuant to § 49-8. He also contends that the defendant violated a July 1, 2013 stipulated agreement between the parties by not marketing and selling the property and that the defendant should not be able to recover under § 49-8 as a result of her alleged breach of the agreement.[5] The defendant argues that she did not waive her claim for damages pursuant to § 49-8 in the July 1, 2013 stipulated agreement; that her alleged noncompliance with the stipulated agreement was irrelevant to the propriety of relief under § 49-8; and, alternatively, that she did not violate the stipulated agreement, as it contained no date by which she was to sell or market the property. The defendant argues that the plain language of § 49-8, which provides that damages are mandatory and not merely permissive, justified the court's award of damages and attorney's fees. We agree with the plaintiff that the court's award of relief pursuant to § 49-8 was not proper in the circumstances of this case.

Resolution of the issue requires an interpretation of § 49-8 and the statutory scheme regarding releases of notices of lis pendens. "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning . . . [we first] consider the text of the statute itself and its relationship to other statutes." (Internal quotation marks omitted.) *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 677, 911 A.2d 300 (2006).

Section 49-8 (b) provides in relevant part: "The plaintiff or the plaintiff's attorney shall execute and deliver a release . . . when a lis pendens or other lien has become of no effect pursuant to section 52-326." In the event that a lis pendens that has become ineffective under General Statutes § 52-326 is not released within sixty days of the sending or receiving of a written request for release, § 49-8 (c) provides that the "plaintiff shall be liable for damages to any person aggrieved at the rate of two hundred dollars for each week after the expiration of such sixty days up to a maximum of five thousand dollars or in an amount equal to the loss sustained by such aggrieved person as a result of the failure of the . . . plaintiff or the plaintiff's attorney to execute and deliver a release, whichever is greater, plus costs and reasonable attorney's fees."

Therefore, pursuant to § 49-8 (b), in order for a party to obtain relief under § 49-8, the lis pendens must first have "become of no effect" under § 52-326. "Section

52-326 provides that a lis pendens may be discharged only under . . . very limited circumstances . . . . See §§ 52-322 and 52-324 of the General Statutes." *Kukanskis* v. *Griffith*, 180 Conn. 501, 507 n.4, 430 A.2d 21 (1980). Section 52-326 provides: "The provisions of sections 52-322 and 52-324 shall apply, mutatis mutandis,[6] to any lis pendens recorded according to the provisions of section 52-325 . . . ."[7] (Footnote added.) Section 52-322 provides in relevant part: "When the estate of any person has been attached . . . and the plaintiff therein has received satisfaction for the plaintiff's claim, or final judgment has been rendered against the plaintiff thereon, or when for any reason such attachment has become of no effect, such plaintiff or the plaintiff's attorney, at the request of any person interested in the estate attached or in having the attachment lien removed, shall file a certificate with such town clerk that such attachment is dissolved and such lien removed. . . ." Section 52-324 provides: "If an attachment, such as is set forth in section 52-322, has been made and the plaintiff has withdrawn the plaintiff's suit or has been nonsuited or final judgment has been rendered against the plaintiff, or if such suit has not been returned, or if for any reason such attachment has become of no effect, the clerk of the court to which such suit has been made returnable shall, upon the request of any person interested, issue a certificate in accordance with the facts, which certificate may be filed in the office of the town clerk, and such town clerk shall record such certificate in the land records."

Sections 52-322 and 52-324 provide for the release of lis pendens in situations in which there has been a resolution of the controversy underlying the lis pendens, such as a plaintiff's receiving satisfaction for his or her claim, the entering of a final judgment, withdrawal of the suit, the summons and complaint not being returned, a nonsuit against the plaintiff, or other reason for the lis pendens to have become ineffective. The statutory scheme, then, specifically refers to situations in which a notice of lis pendens must be released because the underlying controversy no longer exists; it also provides for mechanisms by which a property owner may show that she is entitled to release of a lis pendens.[8] Once that determination has been made, the property owner may request release of the lis pendens, and subsequent failure to comply prompts liability for statutory damages. Pursuant to § 49-8, the remedy, statutory damages of $200 per week after a sixty day period for compliance or actual damages, is commensurate with the purpose served by lis pendens. "A lis pendens is a prejudgment remedy intended to preserve the property until the [court] had an opportunity to hear fully the case and render a final judgment. . . . A notice of lis pendens warns all persons that certain property is the subject matter of litigation and that any interests acquired during the pendency of the action are subject

to its outcome. . . . Accordingly, any party whose interest in the property arose during the interim period is subject to the final judgment. . . . Generally, the doctrine of lis pendens is not applicable to a sale after the proceeding in question has finally been passed upon, even if the litigation ends in a settlement agreement . . . . Lis pendens ends ordinarily with the entry of a final decree from which no appeal is taken." (Citations omitted; internal quotation marks omitted.) *Lee* v. *Duncan*, 88 Conn. App. 319, 328–29, 870 A.2d 1, cert. denied, 274 Conn. 902, 876 A.2d 12 (2005).

None of the situations provided for in the statutory scheme apply to the circumstances of the present case. An encumbrancer has no obligation to release a notice of lis pendens simply because a letter, perhaps replete with good reasons, has been sent by the property owner. The plaintiff's demand letters for the release of the 2010 and 2011 lis pendens, which seem to form a basis for the court's granting of relief,[9] were sent, in June 23, 2011, and February 15, 2013, respectively, dates which occurred during the pendency of this action in the trial court. At that time, there had been no resolution of this action and no determination that the lis pendens were of no effect.

The defendant's two written demands for the release of the 2010 and 2011 notices of lis pendens stated that both notices were invalid because (1) they had not been properly served, and (2) the plaintiff's claim of ownership interest in the property was without merit. As explained previously, the remedy of statutory damages is available only after the lis pendens has been judicially determined to be invalid or the lis pendens has become inoperative because the underlying controversy no longer exists.

"When a property owner challenges the existence of probable cause for the validity of the lis pendens claim, resolution of this application for discharge is governed by General Statutes §§ 52-325a, 52-325b and 52-325c. Section 52-325a prescribes the required content of an application for discharge grounded on an alleged lack of probable cause. Section 52-325b describes the requisite hearing to be held on a § 52-325a application, if probable cause is contested, and assigns the burden of proof on this issue to the lis pendens claimant. Subsection (b) of § 52-325b empowers the trial court, having resolved the probable cause issue, either to deny the application for discharge or to order the notice of lis pendens discharged. To complete the scenario, § 52-325c (a) then provides that '[a]ny order entered as provided in subsection (b) of section 52-325b shall be deemed a final judgment for the purpose of appeal.' Other subsections of § 52-325c: require an appeal to be taken within seven days; provide for a hearing upon an application for a stay, supported by a surety bond, once a timely appeal has been taken; and authorize recordation of an order

discharging a notice of lis pendens.

"When, however, a property owner files a motion for discharge alleging an invalid notice of lis pendens, resolution of this motion is governed in its entirety by General Statutes § 52-325d. Section 52-325d provides relief if the recorded notice of lis pendens: '(1) . . . is not intended to affect real property, or (2) . . . does not contain the information required by subsection (a) of section 52-325 or section 46b-80 . . . or (3) . . . was not [served] in accordance with statutory requirements, or (4) . . . for any other reason . . . never became effective or has become of no effect . . . .' Upon a judicial finding that the notice of lis pendens 'never became effective or has become of no effect,' the court is empowered to issue its order 'declaring that such notice of lis pendens is invalid and discharged.' General Statutes § 52-325d. A certified copy of the order of discharge 'may be recorded in the land records . . . .' General Statutes § 52-325d." (Footnotes omitted.) *Dunham* v. *Dunham*, 217 Conn. 24, 35–39, 584 A.2d 445 (1991).

The remedy provided by § 49-8, then, does not provide relief to the defendant. To the extent that the stipulated agreement of July, 2013, could be deemed to trigger the running of the sixty day compliance period; see, e.g., General Statutes § 49-8 (a) (3); the remedy of statutory damages and attorney's fees was still unavailable, because the notices of lis pendens were released in August, 2013, before the expiration of sixty days from the date of the agreement. We conclude that the court erred in granting the plaintiff damages and attorney's fees pursuant to § 49-8.[10]

The judgment is reversed only with respect to the defendant's slander of title counterclaim under § 49-8 and the case is remanded with direction to render judgment in favor of the plaintiff on the counterclaim. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The plaintiff also named Daniel P. Jones as a defendant in this case, but the trial court rendered judgment dismissing those claims and the plaintiff does not challenge that determination on appeal. We refer to Lawrence as the defendant.

[2] The plaintiff further argues that the principles of promissory estoppel apply. "It is fundamental that claims of error must be distinctly raised and decided in the trial court. . . Our rules of practice require a party, as a prerequisite to appellate review, to distinctly raise such claims before the trial court. See Practice Book § 5-2 . . . see also Practice Book § 60-5. . . . Connecticut appellate courts generally will not address issues not decided by the trial court." (Citations omitted; internal quotation marks omitted.) *Gagne* v. *Vaccaro*, 154 Conn. App. 656, 670, 109 A.3d 500 (2015). This claim was not presented to or decided by the trial court. Accordingly, we decline to afford review.

[3] Additionally, the $61,123.50 was given by the plaintiff to the defendant so that the defendant could satisfy her debt to her former husband. The creation of a resulting trust requires that "purchase money" be paid "at the time of conveyance by one and legal title be taken in the name of another." (Internal quotation marks omitted.) *Neubig* v. *Luanci Construction, LLC*, supra, 124 Conn. App. 434. It is clear from the facts found by the trial court that the $61,123.50 was not paid at the time of conveyance of the property.

Rather, the defendant was, at the time of the payment, the owner of the property, which had been quitclaimed to her by her former husband as part of the dissolution judgment. Nor was the $61,123.50 "purchase money" which is defined as "the initial payment made on property secured by a mortgage." Black's Law Dictionary (9th Ed. 2009).

[4] The defendant also sought damages and attorney's fees pursuant to General Statutes § 14-13. The trial court found that statute inapplicable; that finding is not contested on appeal.

[5] No claim was made for the recovery of ordinary contractual damages.

[6] The term "mutatis mutandis" is defined as: "Those things being changed which should be changed; the respective differences taken into consideration; changed according to circumstances; with the necessary changes." Ballentine's Law Dictionary (3d Ed. 1969).

[7] Section 52-325 sets forth the process by which a lis pendens is to be recorded, including, in subsection (c), a requirement that "the party recording such notice, not later than thirty days after such recording, serves a true and attested copy of the recorded notice of the lis pendens upon the owner of record of the property affected thereby."

[8] See General Statutes § 52-325a, which provides for a hearing when a property owner claims that a notice of lis pendens should be discharged.

[9] The court's award of damages as to the 2010 and 2011 lis pendens, respectively, establishes that the court did not calculate the $200 per week to begin sixty days from July 5, 2013, the date of the stipulated agreement, and to end approximately one month later, when the releases were executed. Rather, damages were calculated to run from the sixty day mark following the request for relief. Damages arising from the allegedly tardy release of the 2010 lis pendens, which occurred more than two years after the sixty day period following the June 23, 2011 request for relief, were set at the $5000 maximum. Damages arising from the release of the 2011 lis pendens were calculated on the basis of the fifteen weeks between the February 15, 2013 request and the August, 2013 release date, less the sixty days allowed for compliance with the request.

[10] The parties argued the case in the trial court and in this court in terms of § 49-8. We consider the issues as argued by the parties. We note, however, that the statutory scheme regarding releases of liens on property generally is consistent with the analysis in the present case. See, e.g., General Statutes § 49-51.