# JOHNSON LEE *v.* WILLIAM M. DUNCAN ET AL.
## (AC 24840)

Bishop, DiPentima and McLachlan, Js.

Argued January 14—officially released April 5, 2005

*Alan R. Spirer*, for the appellant (plaintiff).

*Jeffrey R. Babbin*, with whom was *Aaron Singer*, for the appellees (defendants).

### Opinion

DiPENTIMA, J. The plaintiff, Johnson Lee, appeals from the summary judgment rendered by the trial court in favor of the defendants, William M. Duncan and Patricia M. Duncan. Although the plaintiff raises several issues on appeal, the dispositive one is whether the defendants had notice of the plaintiff's interest in a condominium unit at the time they purchased it. We conclude that they did not and, accordingly, affirm the judgment of the trial court.

The background facts and procedural history are not in dispute. This appeal involves a condominium complex known as the Waterford of Greenwich. The plaintiff was a former developer of the complex. During foreclosure proceedings, the plaintiff and BSB Greenwich Mortgage Limited Partnership (BSB) entered into an agreement regarding the uncompleted complex, which was incorporated into an amended stipulated judgment of strict foreclosure entered in the United States District Court for the District of Connecticut on April 28, 1995. Paragraph thirty of that judgment provided the plaintiff an option on the "final unsold unit" of the complex.[1]

---

[1] Paragraph thirty provides in relevant part: "If the gross sales proceeds of 21 of the 22 Unsold Units . . . are less than $26,500,000.00, [the plaintiff] shall have the option to purchase the remaining completed Unsold Unit for

On June 6, 1995, a certificate of foreclosure was filed in the Greenwich land records indicating that BSB had acquired "absolute" title to the Waterford complex. It made no mention of the plaintiff's option. In addition, the plaintiff recorded an uncertified copy of the amended stipulated judgment of strict foreclosure in the land records on January 3, 1996. The copy was incorrectly indexed in both the grantor and grantee indices with the plaintiff as the grantor and BSB as the grantee. It also incorrectly identified the property as located on Valley Drive.

BSB subsequently developed, marketed and sold the complex units. In late January, 1998, the defendants entered into a purchase and sale agreement with BSB for the purchase of unit one for $1,275,000. At the time, two other units remained unsold. Those two units were later sold, the closings of which occurred on February 26, 1998. Thus, as of February 26, 1998, the last unsold unit in the complex was unit one.

Throughout March, 1998, the plaintiff and BSB exchanged correspondence regarding the plaintiff's right to unit one pursuant to paragraph thirty of the

the amount by which the gross sales proceeds are less than $26,500,000.00. [The plaintiff] shall have a period of 30 days after notice from BSB of the sale of 21 of the remaining 22 Unsold Units in which to exercise said option and close upon the purchase of said remaining unit, time being of the essence. If the gross sales proceeds are less than $26,500,000.00 as aforesaid and in the event that [the plaintiff] elects not to exercise said option or otherwise fails to exercise said option, BSB shall sell the final Unsold Unit and pay to [the plaintiff] the amount by which the gross sales proceeds of all units sold by BSB exceed $26,500,000.00 but in no event shall such payment to [the plaintiff] exceed $1,000,000.00. In the event that the gross sales proceeds of 21 of the 22 remaining Unsold Units within the Waterford Property equal or exceed $26,500,000.00, BSB shall convey the final completed Unsold Unit to [the plaintiff]. During the time that Unsold Units are being marketed, BSB will keep [the plaintiff] reasonably informed as to marketing and sales. Any conveyance to [the plaintiff] pursuant to this paragraph shall be by Quit-Claim Deed as is and where is, as to both its physical condition and state of title with no representations or warranties whatsoever."

stipulated judgment. By letter dated March 27, 1998, the plaintiff informed BSB that "I am entitled to a unit, as originally agreed. . . . [BSB] should deed me [unit one] to complete our agreement." Despite the plaintiff's claim, BSB proceeded with the sale of unit one to the defendants, never informing them of the plaintiff's option pursuant to the stipulated judgment or his March 27, 1998 claim to unit one.

Prior to closing, the defendants purchased a title insurance policy from the Chicago Title Insurance Company (title insurer). The title commitment attached to the policy made no reference to the stipulated judgment or to any interest that the plaintiff might claim in the unit. Likewise, the statutory warranty deed signed by Roderick O'Connor, vice president of BSB, was silent as to the plaintiff's interest. Moreover, on April 17, 1998, O'Connor executed a unit owner's affidavit stating that "there are no tenants or other persons who are in possession or have a right to possession of this unit" and that there were no applicable rights of first refusal. O'Connor also completed an owner's special title and survey report, in which he represented that no person had "claimed to have any interest in [the] property . . . which you dispute and do not recognize as being a valid claim." The defendants closed on the property on April 17, 1998.

Almost one year later, by complaint dated March 30, 1999, the plaintiff filed an action in the Superior Court against the defendants, alleging rights to unit one superior to those of the defendants. The defendants, in turn, filed a third party complaint against BSB, claiming indemnification under the statutory warranty deed and alleging fraud concerning the affidavits provided by BSB at the closing. On March 31, 1999, the plaintiff initiated proceedings in the United States District Court against BSB, seeking an order in aid of enforcement of the stipulated judgment. The District Court rendered

judgment in favor of the plaintiff against BSB in the amount of $1,275,000 with interest of 10 percent per year from April 17, 1998, until payment.

In his action against the defendants, the plaintiff sought an order requiring them to convey to him "all of their right, title and interest to [u]nit [one]," as well as compensatory damages. In response, the defendants raised seven special defenses.[2] Both the defendants and the plaintiff filed motions for summary judgment. By memorandum of decision dated October 31, 2003, the court rendered summary judgment in favor of the defendants on three separate grounds.[3] From that judgment the plaintiff appeals.

The plaintiff claims that the court improperly granted the defendants' motion for summary judgment. Summary judgment is appropriate when "the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle

[2] The special defenses were: (1) the doctrine of unclean hands; (2) the doctrine of laches; (3) the statute of limitations; (4) the doctrines of waiver and estoppel; (5) the stipulated judgment of strict foreclosure failed to comply with the statute of frauds; (6) the defendants lacked actual or constructive notice of the plaintiff's claimed interest in the unit and were bona fide purchasers for value; and (7) the stipulated judgment of strict foreclosure was improperly, erroneously and inaccurately recorded or indexed in the land records.

[3] The court found that (1) the "imprecision and uncertainty" concerning the final unsold unit rendered paragraph thirty of the stipulated judgment unenforceable, (2) the defendants lacked actual and constructive notice of the plaintiff's claimed right, and (3) by "pursuing his claim for damages and obtaining a judgment against BSB, the plaintiff elected to abandon his claim to the unit's title."

him to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact." (Citations omitted; internal quotation marks omitted.) *Barrett* v. *Montesano*, 269 Conn. 787, 791–92, 849 A.2d 839 (2004). "Our review of the trial court's decision to grant [a] motion for summary judgment is plenary." *LaFlamme* v. *Dallessio*, 261 Conn. 247, 250, 802 A.2d 63 (2002).

In its memorandum of decision, the court concluded that the defendants lacked either actual or constructive notice of the plaintiff's claimed right. We consider each in turn.

I

"[O]ne who has actual notice of equitable rights not of record is nevertheless bound to recognize them." *Home Owners' Loan Corp.* v. *Sears, Roebuck & Co.*, 123 Conn. 232, 240, 193 A. 769 (1937). The plaintiff acknowledges that the defendants were not personally aware of the plaintiff's claimed right at the time of closing. Rather, the plaintiff posits that the title insurer was an agent of the defendants. Because the title insurer allegedly had knowledge of the plaintiff's claimed right,[4] the plaintiff contends that that knowledge must be imputed to the defendants.

The burden of proving agency is on the party asserting its existence. *New England Whalers Hockey Club* v. *Nair*, 1 Conn. App. 680, 683, 474 A.2d 810 (1984). "An essential factor in an agency relationship is the right of the principal to direct and control the performance of the work by the agent." *McLaughlin* v. *Chicken Delight, Inc.*, 164 Conn. 317, 322, 321 A.2d 456 (1973); see also *Gateway Co.* v. *DiNoia*, 232 Conn. 223, 240, 654 A.2d 342 (1995). Such control is lacking in the present case.

---

[4] The plaintiff provided no evidentiary support for that allegation.

The purchase and sale agreement between BSB and the defendants required the defendants to accept "such title to the [u]nit as [the title insurer] would be willing to approve and insure . . . ."

A title insurance policy is a contract of indemnity under which the insurer agrees to indemnify the insured in a specified amount against loss through defect of title to real estate. See *Cohen* v. *Security Title & Guaranty Co.*, 212 Conn. 436, 439, 562 A.2d 510 (1989). Accordingly, the relationship between an insurance company and the insured is essentially contractual. See 11 L. Russ & T. Segalla, Couch on Insurance (3d Ed. 1998) § 159:5; *Walker Rogge, Inc.* v. *Chelsea Title & Guaranty Co.*, 116 N.J. 517, 540, 562 A.2d 208 (1989).

"[A] policy of title insurance does not represent an agreement or assurance that a contingency insured against will not occur, but, generally, promises to pay damages, if any, caused by any defects to title that the title company should have discovered but did not . . . ." 11 L. Russ & T. Segalla, supra, § 159:8. Investigation of the title to a particular property prior to issuance of a policy is done not to protect the interests of the insured, but rather the insurer. As the Texas Court of Civil Appeals explained: "[T]he company, before issuing a policy of title insurance, must necessarily take steps to inform itself of the status of the title to be insured. . . . In performing these activities, the company does not act in behalf of the party to be insured, but acts exclusively for itself. Therefore, up to the point where the insurance company commits itself to issue a policy upon certain conditions, the unilateral conduct of the insurance company or its agents in investigating the title does not create an agency relationship." *Tamburine* v. *Center Savings Assn.*, 583 S.W.2d 942, 948–49 (Tex. Civ. App.) (writ refused, October 24, 1979). Likewise, the Arkansas Supreme Court has held that title searches are "undertaken to allow [the insurance company] to

determine the risk and liabilities against which they were insuring. Thus, any acts of negligence in the title search . . . should not have been imputed to [the policyholders] because no agency relationship was present." *Newberry* v. *Scruggs*, 336 Ark. 570, 575, 986 S.W.2d 853 (1999).

This court has neither been presented with nor has it found any authority indicating that a title insurance company's activities in investigating the title to a particular property prior to the issuance of a policy necessarily creates an agency relationship. In light of the foregoing, we conclude that a title insurance company's activities in investigating the title to a particular property prior to issuance of a policy does not constitute an agency relationship between the insurance company and the insured. Accordingly, the plaintiff's claim must fail.

## II

We turn now to whether the defendants had constructive notice of the plaintiff's interest in the unit. "[E]very person who takes a conveyance of an interest in real estate is conclusively presumed to know those facts which are apparent upon the land records concerning the chain of title of the property described in the conveyance . . . ." *Beach* v. *Osborne*, 74 Conn. 405, 412, 50 A. 1019 (1902). "The law implies notice on the ground that it is conclusively presumed that a person will not purchase an interest in a piece of land without examining the condition of the record. Such an act would be required by common prudence." *Hunt* v. *Mansfield*, 31 Conn. 488, 490–91 (1863).

The plaintiff concedes that a certified copy of the stipulated judgment of strict foreclosure was never filed in the Greenwich land records. Thus, paragraph thirty of that judgment, from which originates the plaintiff's

claimed right in unit one, is not contained in the land records.

"It has always been the policy of our law that the land records should be the authentic oracle of title on which a bona fide purchaser . . . might safely rely." (Internal quotation marks omitted.) *Peckheiser* v. *Tarone*, 186 Conn. 53, 57, 438 A.2d 1192 (1982). The plaintiff nevertheless asserts that the filing of a certified copy of the stipulated judgment of strict foreclosure was unnecessary because a certificate of foreclosure was filed in the land records.[5] His argument is flawed for several reasons.

The plaintiff's argument would require the defendants to look beyond the Greenwich land records.[6] That proposition runs contrary to over a century of jurisprudence holding that one searching title to land is not bound to search the records at large, but is bound with only such facts as appear in the chain of title to the particular lot in question. *Powers* v. *Olson*, 252 Conn. 98, 108, 742 A.2d 799 (2000); *Kulmacz* v. *Milas*, 108 Conn. 538, 542, 144 A. 32 (1928); *Wheeler* v. *Young*, 76 Conn. 44, 51, 55 A. 670 (1903).

In addition, the certificate of foreclosure filed on the land records stated that BSB had acquired "absolute" title to the Waterford complex. The plaintiff's argument would not only force the defendants to look beyond the land records, but further would have them disregard the express representations contained therein. Such a

[5] Seven months after the certificate of foreclosure was filed in the land records, the plaintiff attempted to file an uncertified copy of the stipulated judgment of strict foreclosure.

[6] In *Hawley* v. *McCabe*, 117 Conn. 558, 563, 169 A. 192 (1933), the plaintiff claimed "that it is the duty of one searching a title to go beyond the records in the chain of title, and by historical research acquaint himself with the situation at the time each deed was made." Our Supreme Court rejected that proposition, noting that it was "too broad a statement of the duty of the title searcher." Id.

result undermines the integrity of our recording system. "The maintenance of our system of registry of titles is of the greatest public importance, and he who acts in reliance upon the record has behind him not only the natural equities of his position, but also the especial equity arising from the protection afforded every one who trusts the record." *Goldberg* v. *Parker*, 87 Conn. 99, 108, 87 A. 555 (1913).

Finally, the filing of a certified copy of the stipulated judgment of strict foreclosure was required under Connecticut law. General Statutes § 47-36 provides in relevant part that "if any judgment, order or decree of any United States court . . . affects any title to or rights concerning land situated in this state, the instrument evidencing or describing that claim or a certified copy of that judgment, order or decree, or a lis pendens giving notice thereof as authorized by section 52-325 may be recorded in the land records of the town in which the land is situated and may be indexed and released in the same manner as other claims, judgments, orders or decrees. Until so recorded, that claim, judgment, order or lis pendens shall not be effective against the land or constitute constructive notice thereof."

In its memorandum of decision, the court stated that "[t]he language of the statute is clear that until a certified copy of such a judgment is recorded on the land records," no constructive notice may be found. It is undisputed that no certified copy of the stipulated judgment of strict foreclosure was filed. The plaintiff claims that failure to be of no moment. He reads § 47-36 to require the filing of either a certified copy of the judgment *or* a notice of lis pendens. Because he filed a notice of lis pendens during the foreclosure proceedings, he claims to have complied with the statute. We disagree.

The plaintiff misconstrues the purpose behind the notice of lis pendens. A lis pendens is a prejudgment

remedy "intended to preserve the property until the [court] had an opportunity to hear fully the case and render a final judgment." *Ravitch* v. *Stollman Poultry Farms, Inc.*, 162 Conn. 26, 35, 291 A.2d 213 (1971). A notice of lis pendens warns all persons that certain property is the subject matter of litigation and that any interests acquired during the pendency of the action are subject to its outcome. See 5 H. Tiffany, Real Property (3d Ed. 1939) § 1294; see also General Statutes § 52-325 (a). Accordingly, "any party whose interest in the property arose during the interim period is subject to the final judgment." 14 R. Powell, Real Property (2004) § 82A.01 (1). "Generally, the doctrine of lis pendens is not applicable to a sale after the proceeding in question has finally been passed upon, even if the litigation ends in a settlement agreement . . . ." 51 Am. Jur. 2d, Lis Pendens § 59 (2000). "Lis pendens ends ordinarily with the entry of a final decree from which no appeal is taken." 5 H. Tiffany, supra, § 1296; see also *Hartford Federal Savings & Loan Assn.* v. *Stage Harbor Corp.*, 181 Conn. 141, 144–45, 434 A.2d 341 (1980); *Ravitch* v. *Stollman Poultry Farms, Inc.*, supra, 34; *Ghent* v. *Meadowhaven Condominium, Inc.*, 77 Conn. App. 276, 286, 823 A.2d 355 (2003); *Vance* v. *Lomas Mortgage USA, Inc.*, 263 Ga. 33, 36, 426 S.E.2d 873 (1993); *Eich* v. *Czervonko*, 330 Ill. 455, 459, 161 N.E. 864, cert. denied, 278 U.S. 642, 49 S. Ct. 37, 73 L. Ed. 557 (1928); *Aldrich* v. *Chase*, 70 Minn. 243, 246, 73 N.W. 161 (1897); *Arrington* v. *Arrington*, 114 N.C. 151, 159, 19 S.E. 351 (1894); *Gaugert* v. *Duve*, 244 Wis. 2d 691, 707, 628 N.W.2d 861 (2001).

In the present case, the defendants acquired no interest in the subject property during the pendency of the foreclosure proceedings. Rather, they acquired an interest three years after the stipulated judgment of strict foreclosure had entered. Although § 47-36 permits the filing of a notice of lis pendens during the pendency of

legal proceedings, it does not obviate the need for the filing of a certified copy of the judgment once those proceedings have concluded.

The plaintiff in this case was required to file in the Greenwich land records a certified copy of the stipulated judgment of strict foreclosure. That he failed to do. Accordingly, the court properly concluded that the defendants possessed neither actual nor constructive notice of the plaintiff's claimed right to the condominium unit they purchased.

The judgment is affirmed.

In this opinion the other judges concurred.