******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************************

RCN CAPITAL, LLC *v.* CHICAGO TITLE
INSURANCE COMPANY
(AC 42082)

Elgo, Bright and Devlin, Js.

*Syllabus*

The plaintiff, R Co., sought to recover damages from the defendant, C Co.,
a mortgage title insurance company, for, inter alia, breach of contract
in connection with its failure to pay a claim on a policy that it had
issued. The policy insured R Co.'s interests, as a mortgagee, in certain
real property that secured a note executed by S Co. in exchange for a
commercial loan. S Co. defaulted on the note and R Co. commenced
foreclosure proceedings, during which R Co. discovered that its rights
in the property were subordinate to the interests of a superior mortgage
held by M. The property also became subject to a tax foreclosure action,
and R Co.'s and M's mortgages were found to be subordinate to the
interests of the municipality that brought the tax foreclosure action. R
Co. purchased the property for $150,000, pursuant to the tax foreclosure
by sale. As a result of that sale, M received approximately $108,000,
which represented the total purchase price of $150,000 less committee
expenses and the satisfaction of the tax lien. Thereafter, R Co. com-
menced the present action after C Co. failed to pay money damages to
R Co. due to M's superior encumbrance on the property. The trial court
rendered judgment in favor of R Co. and awarded it $108,000, which
represented R Co.'s loss in equity had its mortgage been superior to
that of M. On appeal, R Co. claimed that the trial court improperly
calculated the damages award by using the tax foreclosure sale price
of the property instead of the estimated fair market value of the property
at the time it commenced its foreclosure action. *Held* that the trial court
did not err in calculating R Co.'s damages to be $108,000, which was
the actual amount R Co. did not receive as a result of having to satisfy
M's superior mortgage; R Co.'s claim that the damages should have been
calculated as approximately $270,000, measured as the fair market value
of the property as determined in the foreclosure action less the satisfac-
tion of the tax lien, on the basis that due to the small amount of bidders,
the purchase price from a foreclosure by sale was an unreliable valua-
tion, was unavailing, as the law of contract damages limits an injured
party to its actual loss caused by the breach, and an award in excess
of that amount, based on an estimated fair market value, would have
provided R Co. with an impermissible windfall.

Argued October 25, 2019—officially released March 17, 2020

*Procedural History*

Action to recover damages for, inter alia, breach of
contract, and for other relief, brought to the Superior
Court in the judicial district of Hartford and tried to
the court, *Moukawsher, J.*; judgment for the plaintiff,
from which the plaintiff appealed to this court.
*Affirmed.*

*Jon C. Leary*, for the appellant (plaintiff).

*Frank B. Velardi, Jr.*, for the appellee (defendant).

*Opinion*

ELGO, J. In this breach of contract action, the plaintiff, RCN Capital, LLC, appeals from the judgment of the trial court awarding it $108,000 in damages. On appeal, the plaintiff claims that the court improperly determined the amount of damages. We affirm the judgment of the trial court.

The following relevant facts are not in dispute. On June 28, 2012, Sunford Properties & Development, LLC (Sunford), executed a note in favor of the plaintiff in exchange for a commercial loan in the amount of $600,000. To secure the note, Kwok L. Sang executed and delivered a limited guarantee agreement to the plaintiff, which was secured by a commercial guarantee mortgage deed (mortgage) on certain real property located in Norwich (property).[1] On June 29, 2012, the mortgage was recorded on the Norwich land records.

Under the terms of the loan agreement, Sunford and Sang directed their attorney—an agent of the defendant, Chicago Title Insurance Company—to have the defendant issue a mortgage title insurance policy (policy), insuring the interests of the plaintiff with respect to the property. The policy was executed on June 29, 2012, and provided for up to $600,000 in coverage. The policy insured various types of losses that could be suffered by the plaintiff, including "[t]he lack of priority of the lien of the [i]nsured [m]ortgage upon the [t]itle over any other lien or encumbrance."[2] On November 5, 2013, the policy was modified by way of an endorsement that included, in part, an increase of coverage to $800,000 and reflected the plaintiff's name change. That same day, the note, the limited guarantee, and the commercial guarantee mortgage were also modified to increase the loan amount to $800,000.

On April 1, 2014, Sunford defaulted on the loan. On January 6, 2015, the plaintiff commenced a foreclosure action seeking a judgment of foreclosure on the property.[3] During the foreclosure litigation, the plaintiff learned that its rights in the property as a mortgagee were subordinate to the interest of a mortgage held by the Mashantucket Pequot Tribal Nation (Tribal Nation). The Tribal Nation mortgage was in the principal amount of $1,400,000 and was recorded on the Norwich land records in July, 2007. The plaintiff's original complaint did not identify the Tribal Nation mortgage as an encumbrance on the property.[4]

On April 27, 2015, the property became the subject of a tax foreclosure action commenced by the city of Norwich (tax foreclosure action). Both the plaintiff's mortgage and the Tribal Nation mortgage were found to be subordinate in right to the interests of Norwich.[5] On May 12, 2016, the court in the tax foreclosure action rendered a judgment of foreclosure by sale of the property.

On May 16, 2016, the court in the plaintiff's foreclosure action rendered a judgment of strict foreclosure and found the property to have a fair market value of $304,000.[6] On August 19, 2016, the plaintiff purchased the property for $150,000 pursuant to the tax foreclosure by sale. As a result of the sale to the plaintiff, the Tribal Nation received $108,478.32, which represented the total purchase price of $150,000 less committee expenses and satisfaction of Norwich's tax lien. Having now acquired the property through the tax foreclosure action, the plaintiff filed a motion to open the judgment in its own foreclosure action. After the court granted that motion, the plaintiff withdrew its count seeking foreclosure of the property.[7]

On April 26, 2016, the plaintiff notified the defendant of its claim for monetary damages under the policy. After the defendant failed to pay on the claim, the plaintiff instituted this action against the defendant. In its revised complaint dated May 23, 2017, the plaintiff alleged a single count of breach of contract and sought monetary damages for the defendant's failure to pay the claim submitted under the policy. On February 20, 2018, the court, *Noble, J.*, denied the defendant's motion for summary judgment as to liability. In its memorandum of decision, the court found that, although "the plaintiff acquired title [to the property] free and clear of the Tribal Nation's mortgage . . . it was required to satisfy the Tribal Nation's superior encumbrance to the extent of the equity remaining in the property. The partial satisfaction of the Tribal Nation's mortgage deprived the plaintiff of access to equity otherwise available to it to satisfy the debt owed it, thereby causing it to suffer actual loss."

After the defendant conceded liability at trial, the court, *Moukawsher, J.*, rendered judgment in favor of the plaintiff on August 27, 2018, awarding the plaintiff $108,000 in damages. In its memorandum of decision, the court rejected the plaintiff's damages valuation of $269,337.08, which represented the fair market value of the property at the time of the plaintiff's foreclosure action less the $34,662.92 in taxes paid to Norwich. Relying on *Cohen* v. *Security Title & Guarantee Co.*, 212 Conn. 436, 562 A.2d 510 (1989), the court found that, because $108,000 was the actual loss suffered by the plaintiff, "[a]ny other amount is not a reflection of the security impairment actually suffered by the [plaintiff] . . . ." This appeal followed.[8]

On appeal, the plaintiff challenges the court's measurement of damages. Specifically, it argues that the court improperly valued its damages at $108,000, representing the actual loss of equity it would have received if its mortgage had priority over the Tribal Nation's mortgage. The plaintiff asserts that the proper valuation of damages should have been the fair market value of the property as determined in its foreclosure action less

the satisfaction of the Norwich tax lien. We disagree.

"Our standard of review applicable to challenges to damages awards is well settled. . . . [T]he trial court has broad discretion in determining damages. . . . The determination of damages involves a question of fact that will not be overturned unless it is clearly erroneous. . . . [If], however, a damages award is challenged on the basis of a question of law, our review [of that question] is plenary." (Internal quotation marks omitted.) *Commerce Park Associates, LLC* v. *Robbins*, 193 Conn. App. 697, 735, 220 A.3d 86 (2019), cert. denied sub nom. *Robbins Eye Center, P.C.* v. *Commerce Park Associates, LLC*, 334 Conn. 912, 221 A.3d 447 (2020), and cert. denied sub nom. *Robbins Eye Center, P.C.* v. *Commerce Park Associates, LLC*, 334 Conn. 912, 221 A.3d 448 (2020).

We begin by noting that "[a] title insurance policy is a contract of indemnity under which the insurer agrees to indemnify the insured in a specified amount against loss through defect of title to real estate. . . . Accordingly, the relationship between an insurance company and the insured is essentially contractual." (Citation omitted.) *Lee* v. *Duncan*, 88 Conn. App. 319, 325, 870 A.2d 1, cert. denied, 274 Conn. 902, 876 A.2d 12 (2005). Because the resolution of this claim necessarily involves the interpretation of an unambiguous contract, our review is plenary. See, e.g., *Joseph General Contracting, Inc.* v. *Couto*, 317 Conn. 565, 575, 119 A.3d 570 (2015).

The title insurance contract at issue in the present case provides for coverage against loss caused, in part, by "[t]he lack of priority of the lien of the [i]nsured [m]ortgage upon the [t]itle over any other lien or encumbrance." Expressly excluded from coverage are "[d]efects, liens, encumbrances, adverse claims, or other matters . . . resulting in no loss or damage to the [plaintiff]." As our Supreme Court has held, "[t]his exclusion reflects the fact that [t]itle insurance is . . . an indemnity contract and as such it is to provide reimbursement for *actual* loss only."[9] (Emphasis in original; internal quotation marks omitted.) *Cohen* v. *Security Title & Guarantee Co.*, supra, 212 Conn. 439. Thus, the proper measurement of damages is limited to the actual loss suffered by the plaintiff.

As the trial court found in denying the defendant's motion for summary judgment, the plaintiff could acquire title to the property free and clear of encumbrances only by partially satisfying the Tribal Nation's superior mortgage. The record unequivocally indicates that the plaintiff would have received approximately $108,000 had its mortgage been superior to that of the Tribal Nation's mortgage. Because its mortgage was not superior, the court found that the plaintiff sustained an actual loss of approximately $108,000 upon its purchase of the property pursuant to the tax foreclosure action.

In challenging this valuation, the plaintiff submits that the correct methodology for calculating damages is the fair market value of the property determined during the plaintiff's foreclosure action ($304,000) less the amount required to satisfy Norwich's tax lien ($33,780), for a total of $270,220. It asserts that, due to the small number of bidders, the purchase price from a foreclosure by sale is an unreliable valuation for purposes of damages.[10]

In support of its claim that the sales price from a foreclosure sale is not reliable for the valuation of damages, the plaintiff cites to *New England Savings Bank* v. *Lopez*, 227 Conn. 270, 630 A.2d 1010 (1993). In that case, the defendants claimed that the trial court's use of the foreclosure sale price of the property—instead of the property's fair market value—to calculate a deficiency judgment violated their right to due process. Id., 274–75. In rejecting this claim, our Supreme Court stated in dicta that, unlike a foreclosure by sale, "[f]air market value is generally said to be the value that would be fixed in fair negotiations between a desirous buyer and a willing seller, neither under any undue compulsion to make a deal. . . . An auction sale, such as a foreclosure sale, is not designed to reach that result because there is no opportunity for negotiations, and the seller, namely, the committee appointed by the trial court to conduct the sale, *is* under compulsion to make a deal, in the sense that it is required to take the highest bid . . . ."[11] (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 280.

Our appellate courts have not had the occasion to address the issue of the measurement of an actual loss sustained by an insured lender under a title insurance policy for purposes of calculating damages. Courts in other states, however, have used the foreclosure sale price to determine the actual loss suffered by an insured mortgagee under an insurance policy when that loss resulted from a superior encumbrance.[12] See *Grunberger* v. *Iseson*, 75 App. Div. 2d 329, 331–32, 429 N.Y.S.2d 209 (1980) (market price is irrelevant to determining actual loss under title insurance policy where actual sale price establishes amount available to lienholders); *Chicago Title Ins. Co.* v. *Huntington National Bank*, 87 Ohio St. 3d 270, 274–75, 719 N.E.2d 955 (1999) (appropriate measure of damages under title insurance policy is what buyer actually paid at foreclosure sale and what lender actually received, "not a hypothetical valuation based on speculation had the property been sold on the open market").

Under the present circumstances, we believe that the analysis in *Chicago Title Ins. Co.* v. *Huntington National Bank*, supra, 87 Ohio St. 3d 273, is highly persuasive regarding how to calculate the actual loss suffered by an insured under a title insurance policy. In that case, the Supreme Court of Ohio was presented

with a similar question of whether the actual loss suffered by an insured whose policy covered the insured having first priority with respect to other encumbrances,[13] was the proceeds it would have received from a foreclosure by sale had a superior lien not existed. Id., 273–74. In answering that question in the affirmative, the court emphasized that, when an insured's coverage includes losses incurred as a result of a superior lienholder foreclosing on the property, "[t]he appropriate measure of damages is based upon what the buyer actually paid at the foreclosure sale and what the [superior] lender actually received . . . ." Id., 274. Because the foreclosure sale resulted in the superior lienholder receiving approximately $40,000 in proceeds, and because the insured's indebtedness remained above $60,000, the court held that the $40,000 received by the superior lienholder was the actual loss sustained by the insured. Id. In so doing, the court reasoned that "the use of the actual sale price of the secured property to measure loss instead of an estimated fair market value provides the parties with a conclusive method of valuation that is not based on opinion or speculation." Id., 275. We concur with that assessment.

In the present case, the sale of the property, pursuant to the tax foreclosure action, resulted in a purchase price of $150,000. Of that amount, the Tribal Nation received approximately $108,000 after satisfaction of the Norwich tax lien and foreclosure expenses. But for the Tribal Nation's superior mortgage, the plaintiff, therefore, would have received $108,000. Thus, under the circumstances before us, the plaintiff sustained an actual loss of $108,000. An award in excess of that amount would provide the plaintiff with an impermissible windfall. See *FCM Group, Inc.* v. *Miller*, 300 Conn. 774, 804, 17 A.3d 40 (2011) ("[g]uarding against excessive compensation, the law of contract damages limits the injured party to damages based on his actual loss caused by the breach" [internal quotation marks omitted]). We therefore conclude that the court properly calculated the plaintiff's damages.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The note was also secured by a different property located in Norwich. That property is not relevant to this appeal.

[2] The policy originally named the insured as Entertainment Financial, LLC, which was the former name of the plaintiff. The November 5, 2013 modification of the policy, evidenced by an endorsement, reflected the plaintiff's name change to RCN Capital, LLC.

[3] In a three count complaint, the plaintiff asserted claims against Sunford, Sang, and another individual—Janny Lam. Those claims included (1) foreclosure of a separate property, (2) foreclosure of the property at issue in the present case, and (3) a personal guarantee collection as to Lam.

[4] The plaintiff filed a second revised complaint on December 24, 2015, that identified the Tribal Nation mortgage as superior to its mortgage.

[5] The policy excluded from coverage "[a]ny lien on the [t]itle for real estate taxes or assessments imposed by a governmental authority and created or attaching between [the date] of [the policy] and the date of recording of the [i]nsured [m]ortgage in the Public Records." Neither party argues that the Norwich tax lien was covered by the policy.

[6] The court also rendered judgment in favor of the plaintiff with respect to its claims seeking strict foreclosure of a different property and collection on the personal guarantee.

[7] In its motion to open the judgment, the plaintiff argued that, because the property was sold pursuant to the tax foreclosure action, its claim seeking strict foreclosure of the property was moot.

[8] After this appeal was filed, and in response to the plaintiff's motion for articulation, the court issued an order in which it clarified that it took judicial notice of the pleadings, orders, and judgments in both the plaintiff's foreclosure action and the tax foreclosure action. The court further clarified that "[i]ts decision [on the plaintiff's damages] was made with an understanding of them."

[9] We further note that paragraph 8 of the policy explicitly states that "[t]his policy is a contract of indemnity against *actual* monetary loss or damage sustained or incurred by the [insured] who has suffered loss or damage by reason of matters insured against by this policy." (Emphasis added.)

[10] The plaintiff also asserts that it likely would have paid the Norwich tax lien to avoid the tax foreclosure action from going to judgment. At oral argument before this court, however, the plaintiff conceded that no evidence existed to support that assertion. Such speculation for the purposes of calculating damages is impermissible. See *Meadowbrook Center, Inc.* v. *Buchman*, 149 Conn. App. 177, 191–92, 90 A.3d 219 (2014).

[11] Although not directly relevant to our resolution of this claim, it is not lost on this court that the plaintiff availed itself of the "unreliable" valuation process in order to secure the property at a price well below the fair market valuation of its own expert witness.

[12] We acknowledge that "[t]here is a fundamental distinction between the indemnifiable loss of an insured lender and the indemnifiable loss of an insured owner of property by virtue of title defects or undisclosed liens." *Cale* v. *Transamerica Title Insurance*, 225 Cal. App. 3d 422, 426, 275 Cal. Rptr. 107 (1990). This difference is significant "because [t]he fee interest of an owner is immediately diminished by [the] presence of [a] lien since resale value will always reflect the cost of removing the lien." (Internal quotation marks omitted.) *Twin Cities Metro-Certified Development Co.* v. *Stewart*, 868 N.W.2d 713, 717 (Minn. App. 2015). However, because measuring damages incurred by an insured owner is not before us, we do not address that issue.

[13] The relevant language of the title insurance policy in *Huntington National Bank* is similar to the policy at issue in the present matter. For instance, the policy in that case covered any loss or damage incurred by the insured by reason of "[t]he priority of any lien or encumbrance over the lien of the insured mortgage." *Chicago Title Ins. Co.* v. *Huntington National Bank*, supra, 87 Ohio St. 3d 273. It further excluded from coverage any damages arising from "[d]efects, liens, encumbrances, adverse claims or other matters either created . . . by the insured or resulting in no loss or damage to the insured claimant." (Internal quotation marks omitted.) Id. Moreover, neither the policy in *Huntington National Bank* nor the policy at issue here defined the term "loss." See id.

---